IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 115,309

In the Matter of the Adoption of T.M.M.H.

SYLLABUS BY THE COURT

1.

The Kansas Constitution imposes a case-or-controversy requirement. Part of that requirement, and a component of subject matter jurisdiction, is standing. Standing concerns a litigant's ability to seek a judicial remedy or to seek judicial enforcement of a right or duty.

2.

If a statute provides the basis for asserting a right to seek a judicial remedy, a multilevel analysis applies to the determination of standing: First, courts analyze standing as a matter of statute and, second, as a matter of common law. To meet the common-law requirement, the party seeking to establish standing must establish a sufficient stake in the outcome to obtain judicial resolution of the controversy. Meeting only one prong or the other is insufficient; both prongs must be established.

3.

Adoption, including adoption by a stepparent, was not recognized at common law, and subject matter jurisdiction over such a proceeding is created by statute. The Kansas Adoption and Relinquishment Act (KARA), K.S.A. 59-2111 et seq., sets out who should be given notice, who must consent, and who may participate in a stepparent adoption proceeding.

1

4.

Statutory standing in an adoption case on appeal is governed, in part, by K.S.A. 2016 Supp. 59-2401a(a), (b), which allows an "interested party" to bring an appeal from any final order, judgment, or decree in an adoption proceeding.

5.

Under K.S.A. 2016 Supp. 59-2401a(e)(1), (e)(7), or (e)(8), an "interested party" in an adoption proceeding could be a parent, the petitioner, or a person granted interested party status by the court from which the appeal is being taken.

6.

Simply pressing a point without pertinent authority, or without showing why it is sound despite a lack of supporting authority, is akin to failing to brief an issue. Where the appellant fails to brief an issue, that issue is waived or abandoned.

7.

The nature of the burden to establish the elements of standing, which rests with the party asserting it, depends on the stage of the proceedings—whether the question of standing has arisen at the pleading stage, through motions supported by affidavits or other facts, or at the final stage of trial.

8.

A party asserting a claim on appeal bears the burden to designate facts in the record on appeal to support that claim; without such a record, appellate courts presume the action of the district court was proper.

9.

Under Supreme Court Rule 8.03(a)(4)(C) (2018 Kan. S. Ct. R. 53), when this court reviews a decision of the Kansas Court of Appeals, it will not consider issues not presented or fairly included in the petition for review.

10.

Although Supreme Court Rule 165 (2018 Kan. S. Ct. R. 215) requires a district court to make adequate findings and conclusions regarding contested matters, a party also has the obligation to object to inadequate findings of fact and conclusions of law in order to preserve an issue for appeal because this gives the trial court an opportunity to correct any findings or conclusions that are argued to be inadequate.

Review of the judgment of the Court of Appeals in an unpublished opinion filed December 2, 2016. Appeal from Johnson District Court; MICHAEL P. JOYCE, judge. Opinion filed May 11, 2018. Judgment of the Court of Appeals affirming the district court is affirmed. Judgment of the district court is affirmed.

*Joseph W. Booth*, of Lenexa, argued the cause and was on the briefs for appellant legal custodian-grandmother.

*Suzanne Valdez*, of Smith Legal, L.L.C., of Lawrence, argued the cause and was on the briefs for appellee stepfather.

*Linus L. Baker*, of Stilwell, was on the brief for amicus curiae National Association for Grandparenting.

*Lindsee A. Acton* and *Warren H. Scherich III*, of Scherich Family Law, PC, of Shawnee were on the brief for amicus curiae National Association of Social Workers and the Kansas Chapter of the National Association of Social Workers.

The opinion of the court was delivered by

PER CURIAM:  In this appeal, a paternal grandmother (Grandmother) appeals a district court's determination that she was not an interested party in a stepparent adoption proceeding relating to her grandson, T.M.M.H. She acknowledges precedent that holds a grandparent is not typically an interested party who has standing in stepparent adoption cases. Nevertheless, she asserts her circumstances distinguish her from other grandparents and give rise to a number of legal theories that serve as a basis for granting her interested party status and recognizing her standing to challenge the stepparent adoption. These theories depend on or arise from (1) court orders in a separate grandparent visitation case that is not the subject of this appeal, (2) agreements between the Grandmother and T.M.M.H.'s biological mother (Mother), and (3) the relationship that developed between Grandmother and T.M.M.H. as a result of the custodial arrangements agreed to by Mother and Grandmother or ordered by the court in the separate case.

We reject these arguments on procedural grounds and conclude Grandmother has failed to meet her burden of establishing her standing.

FACTS AND PROCEDURAL BACKGROUND

T.M.M.H., who was born on November 5, 2006, was a few months old when his father died in 2007. When T.M.M.H. was young, Mother and Grandmother agreed he would live for a period of time with Grandmother. We know little about this agreement. Whatever the initial arrangement may have been between Mother and Grandmother, at some point in 2008, Grandmother filed a petition in district court for grandparent visitation.

4

Several years later, on August 6, 2015, this stepparent adoption case was filed to formally endow Mother's husband (Stepfather) with parental rights to T.M.M.H. The visitation case, which continues to be litigated, and the adoption case remained as separate proceedings in the Johnson County District Court. The two cases were not consolidated, and they were assigned to different judges.

Since T.M.M.H.'s birth, Mother and Grandmother have apparently reached several agreements. Some appear—or at least the initial agreement appears—to have been reached outside of any court process and others as part of the visitation case. In the parties' arguments, the agreements are referred to by different names, including "private parenting contract" and "parenting plan."

In February 2015, the court handling the grandparent visitation case held a three-day trial. It is unclear what prompted the hearing or what evidence was presented. On April 13, 2015, the district court issued a journal entry and order, which is included in the record of this case. The order "granted joint legal custody." It also required "the minor child be reintegrated into [Mother's] life and family." The court retained the authority to "make decisions [related] to joint legal custody, but only when the parties are unable to do so." The issue was set for rehearing on June 25, 2015. It is unknown if that rehearing occurred and, if so, its result.

About six weeks later, Stepfather filed a Petition for Adoption in Johnson County District Court. Mother consented. The court appointed a Guardian ad Litem, set the petition for hearing, and required notice "be provided to all interested parties hereto, including but not limited to [Grandmother]." The court adopted the language of Stepfather's proposed order without independently analyzing whether Grandmother was an interested party entitled to notice at this point in the adoption proceeding.

Grandmother responded to the notice by, among other things, arguing the stepparent adoption petition collaterally attacked the orders in the visitation case and impeded her rights. She later moved to compel depositions. In a January 6, 2016, telephonic hearing, the court sua sponte questioned Grandmother's status as an interested party and, correspondingly, her standing. Grandmother then propounded discovery requests. In response, Stepfather asserted Grandmother's lack of standing. Grandmother filed a verified response, but no hearing was held to allow the formal admission of evidence related to standing. On February 26, 2016, the court issued its "Order Regarding Standing and Denying Motion to Compel Depositions," in which it concluded Grandmother had standing to receive notice but lacked standing to participate in the case, was not an interested party in the adoption proceeding, and could not compel depositions.

In determining Grandmother's standing, the stepparent adoption court reviewed K.S.A. 2016 Supp. 59-2129(c), which lists the parties whose consent is required for a stepparent adoption. The court noted grandparents, even those with visitation, are not entitled to notice under the statute. The court acknowledged Grandmother had joint legal custody arising out of a case that began as an action for grandparent visitation under K.S.A. 38-129(b) (now codified at K.S.A. 2016 Supp. 23-3301[c]), but found the custody arrangement did not confer standing. The court rejected Grandmother's position that she was a permanent legal custodian, finding the only basis for awarding such status is the Kansas Code for Care of Children, specifically K.S.A. 2016 Supp. 38-2272. The court ruled its decision was controlled by *Browning v. Tarwater*, 215 Kan. 501, 524 P.2d 1135 (1974) (grandmother not an interested party, not entitled to notice of stepparent adoption), and *In re Adoption of J.A.B.*, 26 Kan. App. 2d 959, 969, 997 P.2d 98 (2000) (no error in district court holding grandparent had standing to participate in adoption proceeding solely on issue of visitation but "grandparents' rights in the adoption proceeding are limited to a determination of whether reasonable visitation should be granted").

6

Grandmother appealed, and the Court of Appeals affirmed the district court. *In re Adoption of T.M.M.H.*, No. 115,309, 2016 WL 7032112 (Kan. App. 2016) (unpublished opinion).

The Court of Appeals panel began its legal analysis by questioning whether jurisdiction existed because the appeal had not been taken from a final order. 2016 WL 7032112, at *2. The panel concluded it had jurisdiction under the collateral order doctrine because the district court order conclusively determined the issue of Grandmother's standing; the standing issue was an important one separate from the merits of the adoption; and an immediate appeal was required because, otherwise, Grandmother would be powerless to appeal a final judgment in the adoption proceeding. 2016 WL 7032112, at *3.

Next, the panel addressed the significance of the joint legal custody arrangement between Mother and Grandmother. The panel looked to Kansas statutes for a definition of joint legal custody. The only reference it found was in the context of custody between divorcing parents. The panel then looked to the record for clarification of the nature of the agreement between Mother and Grandmother. It found the record contained only two relevant documents: a journal entry filed in the grandparent visitation case on September 30, 2015, and the order finding Grandmother lacked standing in the stepparent adoption case. The panel concluded Grandmother failed to designate sufficient facts to support her claim; the district court decision was proper in the absence of a sufficient record; and Kansas statutory law did not require a different result. 2016 WL 7032112, at *6.

The panel then considered whether grandparents have any rights in cases of stepparent adoption generally. 2016 WL 7032112, at *6. The panel reviewed the persons who are required to provide consent to a stepparent's adoption, which does not include a grandparent even when the grandparent has visitation rights. The panel ruled the statute

authorized the district court to provide notice to Grandmother, which the district court had done, but that notice did not give Grandmother a right to "conduct depositions or otherwise participate in the adoption hearing." 2016 WL 7032112, at *6.

The panel, while acknowledging that Grandmother's relationship was unique, observed that guardianship was the legal status most analogous to that conferred upon Grandmother. 2016 WL 7032112, at *7. The panel then determined that the parental preference doctrine applied. It rejected Grandmother's argument that Mother had waived her parental preference by agreeing to share joint legal custody with Grandmother, because Grandmother failed to meet her burden of proving a knowing waiver of the preference. 2016 WL 7032112, at *8.

Finally, the panel rejected Grandmother's argument that she should be allowed to participate in the stepparent adoption to advocate for the best interests of the child, concluding the best interests test did "not apply in determining a fit parent's custodial right as against a third-party nonparent's right." 2016 WL 7032112, at *8. The panel concluded: "[E]ven if the record had fully supported Grandmother's claim that her status as a joint legal custodian of the child generally gives her the right to make decisions in the best interests of the child, that right must yield to the conflicting right of the fit Mother." 2016 WL 7032112, at *8.

Grandmother filed a petition seeking this court's review of the Court of Appeals decision, which we granted.

ANALYSIS

The sole issue in this case is whether the district court erred when it determined Grandmother was not an interested party—and therefore did not have standing—to

8

participate in the stepparent adoption. That issue requires us to interpret Kansas statutes and the legal effect of the parties' agreement and court orders. These are questions of law over which this court exercises unlimited review. *State ex rel. Secretary of DCF v. Smith*, 306 Kan. 40, 48, 392 P.3d 68 (2017) (statutory interpretation); *Gannon v. State*, 298 Kan. 1107, 1122, 319 P.3d 1196 (2014) (standing); *Frazier v. Goudschaal*, 296 Kan. 730, 748, 295 P.3d 542 (2013) (interpretation and legal effect of written instruments).

To explore the issue of standing, we necessarily start with some basic principles: The Kansas Constitution imposes a case-or-controversy requirement. *Sierra Club v. Moser*, 298 Kan. 22, 29, 310 P.3d 360 (2013); *State ex rel. Morrison v. Sebelius*, 285 Kan. 875, 895-96, 179 P.3d 366 (2008). Part of that requirement, and a component of our subject matter jurisdiction, is standing. *Sierra Club*, 298 Kan. at 29. We have described standing as "'a party's right to make a legal claim or seek judicial enforcement of a duty or a right.'" *KNEA v. State*, 305 Kan. 739, 746, 387 P.3d 795 (2017).

Before us, Grandmother argues the Court of Appeals erroneously focused on various statutes to determine if she had standing to contest the adoption proceeding rather than focusing on whether she met the common-law standing test. Under the common-law test a party seeking to establish standing must have a "sufficient stake in the outcome of an otherwise justiciable controversy in order to obtain judicial resolution of that controversy." *Moorehouse v. City of Wichita*, 259 Kan. 570, 574, 913 P.2d 172 (1996). Accordingly, Grandmother at least implies she need only establish common-law standing.

In making this argument, Grandmother does not discuss the two-prong standing test that applies when a statute provides the basis for asserting a right to seek a judicial remedy. Under this test, courts analyze standing as a matter of (1) statute and (2) common law. *Sierra Club*, 298 Kan. at 29. Meeting only one prong or the other is

insufficient; both prongs must be established. See *Cochran v. Kansas Dept. of Agriculture*, 291 Kan. 898, 908-09, 249 P.3d 434 (2011).

The first question, of course, is whether that test applies in adoption proceedings. Most cases applying the test arise under the Kansas Judicial Review Act (KJRA), K.S.A. 2016 Supp. 77-601 et seq., but it has been applied when standing is dictated by other statutes as well. E.g., *Friends of Bethany Place v. City of Topeka*, 297 Kan. 1112, 1121-22, 307 P.3d 1255 (2013) (plaintiff-association required to establish standing under the Historic Preservation Act and traditional-associational standing); *Cochran*, 291 Kan. at 903-10 (considering standing under the Kansas Water Appropriation Act and KJRA when both provided a basis for standing and were not in conflict with each other and traditional standing analysis).

Grandmother does not suggest any reason both prongs of the standing test would not apply in a stepparent adoption case, and several aspects of adoption law suggest that the statutory test must be met. Indeed, "[a]doption was not recognized at common law, and subject matter jurisdiction over such a proceeding is created by statute." *In re Adoption of H.C.H.*, 297 Kan. 819, 825, 304 P.3d 1271 (2013). Likewise, "[t]he right to appeal [in civil cases, including actions involving parental rights,] is entirely statutory and is not a right contained in the United States or Kansas Constitutions." *In re T.S.W.*, 294 Kan. 423, 432, 276 P.3d 133 (2012). Furthermore, past cases of this court dealing with standing issues in the context of adoption have focused on statutory standing, even if not explicitly using those words or setting out the two-prong test.

For example, in *Browning*, this court recognized a stepparent adoption would impact a grandmother's ability to exercise her visitation rights with her grandchild. In other words, she would suffer injury. But instead of deciding standing on that basis—i.e., common-law standing—the court examined the statute that dictated who must consent to

10

an adoption. Noting that the grandmother's consent was not required in the stepparent adoption, the court concluded there was nothing she "could have done to defeat the adoption" and she was not an interested party. 215 Kan. at 506.

This same conclusion applies in this case as it relates to Grandmother's status as a grandparent with visitation rights. But she asserts additional grounds for her standing. Even as to those, however, *Browning* instructs that statutory standing must be established in addition to common-law standing.

Consequently, we hold Grandmother, in order to appeal, must establish both statutory and common-law standing; she cannot rely solely on common-law standing.

*Statutory Standing and the Right to Appeal*

Statutory standing in the current adoption case is governed, in part, by K.S.A. 2016 Supp. 59-2401a, which is not found in the Kansas Adoption and Relinquishment Act (KARA), K.S.A. 59-2111 et seq., but explicitly includes appeals in adoption cases. In an adoption proceeding, "an interested party" may bring an appeal "from any final order, judgment or decree." K.S.A. 2016 Supp. 59-2401a(a), (b).

The Court of Appeals panel, focusing on this statute, issued a show cause order and eventually asked the parties to brief the question of whether a final order was being appealed. Ultimately, the panel determined a final order was not involved but the appeal could still be brought under the collateral order doctrine. 2016 WL 7032112, at *3. Stepfather did not cross-petition for review of this issue. Typically, this would preclude our review of the question. See Supreme Court Rule 8.03(h)(1) (2018 Kan. S. Ct. R. 56) ("[I]ssues before the Supreme Court include all issues properly before the Court of Appeals which the petition for review or cross-petition allege were decided erroneously

11

by the Court of Appeals."); *State v. Keenan*, 304 Kan. 986, 993, 377 P.3d 439 (2016) ("Because the State did not cross-petition to challenge the Court of Appeals' preservation ruling in favor of [the defendant], we will not consider whether the panel erred on this point.").

Nevertheless, because jurisdiction may be raised sua sponte by a court, this rule may not be applicable in this situation. See *Kansas Bldg. Industry Workers Comp. Fund v. State*, 302 Kan. 656, 666, 359 P.3d 33 (2015) ("An appellate court can make a *sua sponte* inquiry into whether it has jurisdiction over a question presented to it on appeal."). In this case, however, little would be gained by reopening the question without further briefing by the parties, especially when we determine Grandmother has failed to establish a record sufficient to show she meets the interested party requirement of K.S.A. 2016 Supp. 59-2401a, which means this court lacks jurisdiction over this appeal on that basis even if the lack of a final order is not determinative.

To explain our conclusion that this court lacks jurisdiction, we return to K.S.A. 2016 Supp. 59-2401a, which defines "interested party" by listing eight categories of individuals. One provision relates only to adoption cases; it specifies that "'interested party'" means:  "The parent in a proceeding pursuant to" the KARA. K.S.A. 2016 Supp. 59-2401a(e)(1). But two general provisions apply as well. One general provision allows an appeal by "the petitioner in the case on appeal" and the other by "any other person granted interested party status by the court from which the appeal is being taken." K.S.A. 2016 Supp. 59-2401a(e)(7), (8).

Notably, this statute does not include grandparents or legal custodians in the definition of "interested parties." Cf. *In re D.D.P.*, *Jr.,* 249 Kan. 529, 542, 819 P.2d 1212 (1991) ("If the grandfather has standing to appeal [in this child-in-need-of-care proceeding], then he must have been designated an 'interested party.'"). As a result, we

12

need not consider three of the four issues presented in Grandmother's Court of Appeals brief because they relate specifically to Grandmother's status as joint legal custodian. Even if the district court erred in its rulings regarding Grandmother's rights as a legal custodian, that status was insufficient to grant statutory interested party standing.

*Grandmother Was Not the Petitioner and Was Denied Interested Party Status*

Considering the three categories of interested party listed in K.S.A. 2016 Supp. 59-2401a(e)—a parent, the petitioner, and a person designated by the district court as an interested party—we begin with the most straightforward: Stepfather filed the petition in this case, and therefore Grandmother cannot claim to be an interested party because she is a petitioner.

Turning to another category, we conclude Grandmother cannot appeal as someone granted interested party status. Although the district court initially ordered notice be given to Grandmother as an interested party, the court ultimately denied Grandmother interested party status. Moreover, Grandmother does not rely on her interested party status as the basis for her appellate standing. Nor does she assert her standing arises from her temporary status as an interested party. As such, she has waived any such argument. "'Simply pressing a point without pertinent authority, or without showing why it is sound despite a lack of supporting authority, is akin to failing to brief an issue. "Where the appellant fails to brief an issue, that issue is waived or abandoned."'" *State v. Angelo*, 306 Kan. 232, 236, 392 P.3d 556 (2017) (quoting *McCain Foods USA, Inc. v. Central Processors, Inc.*, 275 Kan. 1, 15, 61 P.3d 68 [2002]).

Instead, Grandmother presents the issue on appeal as one arising because she does *not* have interested party status; she argues the district court erred in denying her that status. Thus, as the issue is presented to us, Grandmother's standing to appeal cannot

13

stand on her designation as an interested party. Although this may appear harsh or unfair because it leaves someone who believes the district court erred when denying interested party status without an appellate remedy, no arguments have been presented suggesting we must interpret the statute in some way other than its plain language. Any such arguments have also been waived. See *Angelo*, 306 Kan. at 236. Furthermore, the right to appeal is statutory and only the legislature can revise the statute. See *In re Condemnation of Land v. Stranger Valley Land Co.*, 280 Kan. 576, 578, 123 P.3d 731 (2005).

*Grandmother Has Not Established a Basis for Determining Parentage*

This leaves the third category of "parent" and Grandmother's arguments as to why she should be considered a parent. Grandmother argues she has statutory standing as a parent, either because of the court orders, because of her agreements with Mother, or because of her de facto relationship with T.M.M.H.

We first note that Grandmother primarily relied on different arguments before the district court where she told the court she was "asserting her rights as a custodian"; "her standing arises because of her status of legal custodian"; and "Legal parents and Legal Custodians rights are different." And the district court's ruling focused on these arguments. Nevertheless, Grandmother also argued Mother had waived her parental preference and made Grandmother a co-parent. She asserted "the general class of 'parent' includes [Grandmother] as a permanent legal custodian, a status that was granted by [Mother] and confirmed by later court action." In support of that argument, Grandmother relies on two Kansas cases to argue the parental preference can be waived or shared by agreement with a third party—that is, someone other than the biological or adoptive parent: *Frazier*, 296 Kan. at 753, and *In re Marriage of Nelson*, 34 Kan. App. 2d 879, 884, 125 P.3d 1081 (2006).

14

In *Frazier*, this court enforced parenting agreements between a birth mother and her same-sex partner. The first agreement was entered into before the birth of the first child. The agreement—and a similar one entered into before the birth of a second child—identified the same-sex partner as a "de facto parent," specified that her "'relationship with the children should be protected and promoted,'" and expressed the parties' intention "'to jointly and equally share parental responsibility.'" The agreements further provided the parties would pay child support and jointly make major decisions affecting the children. Each woman also executed a will naming the other as the children's guardian. The same-sex partner invoked the court's equitable jurisdiction to specifically enforce the agreements. 296 Kan. at 733-34.

In enforcing the agreements, this court found the co-parenting agreements were "not rendered unenforceable as violating public policy merely because the biological mother agreed to share the custody of her children with another, so long as the intent, and effect, of the arrangement was to promote the welfare and best interests of the children." 296 Kan. at 751. The court discussed the parental preference doctrine, on which Stepfather in this case heavily relies. Under that doctrine:

> "[A] parent who is not found to be unfit, has a fundamental right, protected by the Due Process Clause of the United States Constitution, to the care, custody and control of his or her child, and . . . the right of such a parent to custody of the child cannot be taken away in favor of a third person, absent a finding of unfitness on the part of the parent." *Sheppard v. Sheppard*, 230 Kan. 146, 154, 630 P.2d 1121 (1981).

The *Frazier* court determined "parental preference can be waived and . . . courts should not be required to assign to a mother any more rights than that mother has claimed for herself." 296 Kan. at 753 (citing *In re Marriage of Nelson*, 34 Kan. App. 2d 879). Thus the court gave effect to the natural mother's waiver of parental preference in favor of a third party when the waiver was made knowingly, intelligently, and voluntarily.

15

296 Kan. at 751-52. The court also gave effect to the agreement's designation of the same-sex partner as a de facto parent. 296 Kan. at 753.

A Court of Appeals panel similarly gave effect to a parent's waiver of the parental preference doctrine in *In re Marriage of Nelson*, 34 Kan. App. 2d 879, the second case cited by Grandmother. There, both biological parents knowingly waived the parental preference doctrine during divorce proceedings and agreed to grant custody to a paternal aunt of the child. Later, when the mother sought custody and asserted she was entitled to custody under the parental preference doctrine, the panel held the mother could not rely on the doctrine after she had voluntarily and expressly waived it. 34 Kan. App. 2d 883-84.

Grandmother argues *Frazier* and *In re Marriage of Nelson* support her argument that she can be a grandparent and, through agreements with Mother and orders of the grandparent visitation court, also be legally and emotionally a co-parent. And before the district court in her verified brief she asserted T.M.M.H. had spent "90% of his young life with [her] as primary caregiver." She also explained she had provided all financial support during the time the mother had "surrendered custody." She further asserted "the general class of 'parent' includes [her] as a permanent legal custodian."

The Court of Appeals panel did not discuss these possibilities in depth because it correctly concluded the record on appeal in this case is insufficient to know the exact contours of any of the agreements between Mother and Grandmother. The panel noted the parties described the agreements using a variety of terms but nothing in the record allowed a determination of "whether the agreements merely establish where the child will reside during the year, or if they establish additional duties and responsibilities such as having control of the minor and providing for the minor's care, treatment, habilitation, education, support, and maintenance." *In re Adoption of T.M.M.H.*, 2016 WL 7032112,

16

at *6. In light of the lack of information, the panel held that Grandmother failed to meet her burden of establishing standing. 2016 WL 7032112, at *6 (citing *Friedman v. Kansas State Bd. of Healing Arts*, 296 Kan. 636, 644-45, 294 P.3d 287 [2013]).

Until the Court of Appeals decision, the issue of Grandmother's burden of persuasion received little discussion by the parties. And no Kansas case discusses the issue in much detail in the context of a probate case. In other contexts, we have recognized that the nature of the burden to establish the elements of standing, which rests with the party asserting it, "depends on the stage of the proceedings." *Gannon v. State*, 298 Kan. 1107, 1123, 319 P.3d 1196 (2014) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561, 112 S. Ct. 2130, 119 L. Ed. 2d 351 [1992]). In most civil cases,

> "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.' [Citation omitted.] In response to a summary judgment motion, however, the plaintiff can no longer rest on such 'mere allegations,' but must 'set forth' by affidavit or other evidence 'specific facts,' [citation omitted], which for purposes of the summary judgment motion will be taken to be true. And at the final stage, those facts (if controverted) must be 'supported adequately by the evidence adduced at trial.'" *Lujan*, 504 U.S. at 561.

These stages do not fit exactly with procedures under KARA or the Probate Code in general. Nevertheless, they persuasively suggest a framework for our analysis that requires elevating the level of proof. See, e.g., *In re Estate of Cipra*, 173 Kan. 334, 337, 246 P.2d 267 (1952) (When no specific provision of the Probate Code addresses a pleading issue, this court has looked to cases dealing with civil procedure for guidance.).

Regarding the lowest possible burden, Grandmother did not advance an argument that the district court should adjudicate standing based on mere assertions in her brief.

17

See *Aeroflex Wichita, Inc. v. Filardo*, 294 Kan. 258, 264-65, 275 P.3d 869 (2012) (at the pleading stage, the party asserting standing has the burden to establish a prima facie case of standing, that is, a basis when viewed in the light most favorable to the party). As such, any such issue has not been preserved for appeal. See *State v. Godfrey*, 301 Kan. 1041, 1043-44, 350 P.3d 1068 (2015) (generally an issue must be raised in district court in order to be preserved for appeal).

In fact, Grandmother moved beyond mere pleadings by filing a verified "Brief Showing as a Legal Custodian [Grandmother] Has Standing" with the district court. We have treated verified documents as evidence as long as not "verified on information and belief." *State, ex rel., v. Molitor*, 175 Kan. 317, 325, 263 P.2d 207 (1953); see *Sperry v. McKune*, 305 Kan. 469, 488, 384 P.3d 1003 (2016). In Grandmother's verified brief, she asked the district court to take judicial notice of the record in the visitation case and she submitted some—but not all—of the relevant documents as attachments. Grandmother also presented, via an attachment to her verified brief, a "Journal Entry and Order" from the grandparent visitation case. It decrees Mother and Grandmother have "joint legal custody" of the child.

The Journal Entry and Order, however, does not address whether Mother made a knowing, intelligent, and voluntary waiver of her parental preference—a point Grandmother must establish in order to advance her theory that Mother waived her parental preference and granted parental status to Grandmother, thereby conferring a basis for standing. See *Frazier*, 296 Kan. at 751 (to give effect to a natural mother's waiver of parental preference in favor of a third party, the waiver must be made knowingly, intelligently, and voluntarily). And Grandmother's own verified statements do not assert that Mother voluntarily and knowingly waived her parental preference. Even at the most minimal level of persuasion, a party with the burden of establishing standing

18

must make a prima facie argument. *Lujan*, 504 U.S. at 561. Grandmother has failed to do so.

We acknowledge Grandmother attached to her petition for review an e-mail chain with the judge presiding over the adoption case who indicated he did "not think those documents are part of the record for the appeal that has been filed." But this e-mail is not a ruling that is part of the record of this case. See Supreme Court Rules 3.01, 3.02 (2018 Kan. S. Ct. R. 19); Supreme Court Rule 6.02(b) (2018 Kan. S. Ct. R. 34) ("The appendix is for the court's convenience *and is not a substitute for the record itself*." [Emphasis added.]); Supreme Court Rule 6.03(b) (2018 Kan. S. Ct. R. 35); see also *State v. Brownlee*, 302 Kan. 491, 505, 354 P.3d 525 (2015); *State v. Warren*, 302 Kan. 601, 614, 356 P.3d 396 (2015) (court would not consider documents appended to brief but never formally introduced as evidence or added to record); *Rodriguez v. U.S.D. No. 500*, 302 Kan. 134, 144, 351 P.3d 1243 (2015) (court would not rely on appendix to brief not part of the record below). We therefore do not consider the e-mail chain in our analysis.

Granted, Grandmother asked the judge in the stepparent adoption case to take judicial notice of the pleadings, orders, files, and records of the visitation case. But the record on appeal does not include a ruling by the judge on Grandmother's request. The fact that the judge later refused to make the files and records of the visitation case a part of the record on appeal in this adoption case suggests the judge either denied the request or never ruled on it.

Nor did Grandmother argue in her brief before the Court of Appeals that the district court erred in failing to formally take judicial notice of the files and records in the grandparent visitation case. And she did not ask the Court of Appeals to take judicial notice. These failures also constitute waivers of these arguments. *Angelo*, 306 Kan. at 236.

19

Finally, we note that Grandmother has not addressed these procedural hurdles. Although Grandmother pointed out her efforts to have the district court consider the visitation case records, she did not argue for a prima facie standard of review or cite any authority supporting that view. Typically, we consider such a failure to be a waiver or abandonment of argument. See *Angelo*, 306 Kan. at 236.

Understandably, given the state of the record and the arguments made by Grandmother, the Court of Appeals appropriately concluded:

> "As the party making the claim, Grandmother bears the burden to designate facts in the record to support that claim; without such a record, we presume the action of the district court was proper. *Friedman v. Kansas State Bd. of Healing Arts*, 296 Kan. 636, 644-45, 294 P.3d 287 (2013). Because no other information is provided in the record on appeal regarding the joint legal custody agreement we presume the district court's findings set forth above were proper." *In re Adoption of T.M.M.H.*, No. 115,309, 2016 WL 7032112, at *6 (Kan. App. 2016) (unpublished opinion).

Moreover, in Grandmother's petition for review of the Court of Appeals decision, she did not mention this holding, much less argue it was erroneous. Under Supreme Court Rule 8.03(a)(4)(C) (2018 Kan. S. Ct. R. 54), this court "will not consider issues not presented or fairly included in the petition [for review]." While Grandmother did ask this court to take judicial notice of the files and records in the grandparent visitation case, she did not provide authority for us to do so when the district court had not explicitly ruled on her request at that level and that failure had not become an issue on appeal. Finally, Grandmother asserts that record could be added with this court's leave, but cites no authority for this court to do so. While this court has authority to add additional parts of the record from this case, that authority does not extend to adding portions of the record

20

from another case. See Supreme Court Rule 3.01 (2018 Kan. S. Ct. R. 19); Supreme Court Rule 3.02(c)(1)(A), (d) (2018 Kan. S. Ct. R. 19).

Grandmother, supported by amicus curiae, also argues her de facto parental status has created an emotional bond that the law protects (or at least should recognize and protect) and that gives her standing as a psychological parent to protect the best interests of the child. The issue of her standing as a psychological parent was not preserved for this court's review, however. We reach this conclusion for two reasons.

First, although Grandmother argued in district court proceedings that she was a psychological parent, the court did not make findings of fact or conclusions of law related to the issue. A party "has the obligation to object to inadequate findings of fact and conclusions of law in order to preserve an issue for appeal because this gives the trial court an opportunity to correct any findings or conclusions that are argued to be inadequate." *Fischer v. State*, 296 Kan. 808, 825, 295 P.3d 560 (2013) (citing Supreme Court Rule 165 [2018 Kan. S. Ct. R. 215]).

Second, in Grandmother's arguments to the Court of Appeals, she coupled her status as an alleged psychological parent to the legal authority granted to her by the parenting agreements and the court orders. This approach was in keeping with *Frazier*, 296 Kan. at 752, in which we noted the psychological parent theory had not yet been accepted by this court absent a written agreement between a birth parent and a de facto parent. Before us, Grandmother attempts to uncouple her status as an alleged psychological parent from her arguments about the parenting agreements and court orders. This creates a new issue of first impression, which she had not presented to the Court of Appeals, or, at least, was not decided by the Court of Appeals. In seeking review of the Court of Appeals decision, Grandmother did not comply with Supreme Court Rule 8.03(a)(4)(C) (2018 Kan. S. Ct. R. 53) (In a civil case, the party seeking this court's

21

review of a Court of Appeals decision must make "[a] statement of the issues decided by the Court of Appeal of which review is sought," and "must list, separately and without argument, additional issues decided by the district court which were presented to, but not decided by, the Court of Appeals.").

As a result of all these procedural failures, Grandmother has achieved the trifecta of reasons an issue is not preserved for this court's review: She failed to preserve various issues relating to statutory standing at the district court, the Court of Appeals, and before this court. Because of Grandmother's failure to meet the statutory prong of the standing test, we need not discuss her arguments about common-law standing.

We acknowledge the parties have made numerous filings following Grandmother's petition for review. Specifically, Grandmother filed a motion to strike Stepfather's reply brief to an amicus brief filed in this case. Upon filing this opinion, we deny this motion as moot.

We also note both parties filed Rule 6.09 letters in this case. Supreme Court Rule 6.09(a)(3) (2018 Kan. S. Ct. R. 39) allows a party to advise the court of persuasive or controlling authority that was published or filed after a petition for review is filed but before the court has ruled on the petition. Both parties submitted filings made in the grandparent visitation case. It is questionable that, in the context of this case, these filings constitute "authority." In these unique circumstances, the filings operate more as an attempt to supplement the record. This is not the purpose of a 6.09 letter. Moreover, Rule 6.09(b) requires the letter "contain a reference to either the page(s) of the brief intended to be supplemented or to a point argued orally to which the citation pertains." Both parties failed to comply with the requirements of Rule 6.09(b). The various 6.09 letters are thus improper and will not be considered. See *State v. Herbel*, 296 Kan. 1101, 1125, 299 P.3d 292 (2013).

CONCLUSION

In conclusion, our ruling is limited to the issue presented in this case: Whether Grandmother has established she is an interested party under the KARA and the Probate Code. We answer this question in the negative on procedural grounds only. We do not reach, and therefore we take no position on, the merits of Grandmother's claim she is a parent by virtue of the agreements and court orders entered in the visitation case. The record is insufficient for us to do so.

For the foregoing reasons, judgment of the Court of Appeals affirming the district court is affirmed. Judgment of the district court is affirmed.

\* \* \*

STEGALL, J., concurring in result and dissenting: This case is a mess. Worse, it is a mess of our own making. Worse still, the person at the center of the mess is an 11-year-old child. In keeping with the intent and spirit of Supreme Court Rule 7.043 (2018 Kan. S. Ct. R. 49), I will refer to the child as "Thomas," though that is not his real name. See *In re F.A.R.*, 242 Kan. 231, 232, 747 P.2d 145 (1987) (avoiding reference to a party by either awkward initials or familial relationship by instead using the generic stand-in term "appellee" in "compliance with the spirit of Supreme Court Rule 7.403"); *In re M.M.L.*, 258 Kan. 254, 255, 900 P.2d 813 (1995) (same, explaining that such a practice was in "compliance with the intent of Supreme Court Rule 7.043").

Thomas' father died when he was a baby. He was six years old when his mother married the man who is trying to adopt Thomas, which is also his mother's wish. Since his father's death—both before and after his mother's remarriage—Thomas' paternal

23

grandmother has been intimately involved in raising Thomas, and they clearly have a strong and intimate bond. On the basis of that bond, Thomas' grandmother objects to the sought after adoption and claims to do so on the ground that by virtue of an agreement with Thomas' mother, she has achieved the legal status of Thomas' second parent. The confusion over who, exactly, has a parent-child relationship with Thomas deserving of legal recognition and protection has generated years of litigation and multiple, sometimes conflicting, court rulings. Our decision today provides no guidance that might prevent similar confusion in the future.

Poor Thomas! It is indeed sad that this child has been assigned to live for much of his young life in familial limbo by our sanctioning of his grandmother's "de facto" parental status via our creative interpretation of the Kansas Parentage Act (KPA), K.S.A. 2016 Supp. 23-2201 et seq., in *Frazier v. Goudschaal*, 296 Kan. 730, 295 P.3d 542 (2013). See *DeShaney v. Winnebago Cnty. Soc. Servs.*, 489 U.S. 189, 213, 109 S. Ct. 998, 103 L. Ed. 2d 249 (1989) (Blackmun, J., dissenting). And now, poor Grandmother. She relied on our decision in *Frazier* to claim the legal status of parent that is now denied to her on the thinnest of procedural grounds. Finally, poor parents and children everywhere. Kansas courts have dissected the parent-child relationship and stitched it back together this-way and that-way leaving confusion and instability where there ought to be certainty—weakening the parent-child relationship in Kansas as a result.

Bad facts make bad law. So goes a common legal maxim. *State v. Lloyd*, 299 Kan. 620, 645, 325 P.3d 1125 (2014) (Johnson, J., dissenting). The corollary truth that bad law tends to make more bad law is less well known but perhaps the more frequent (and more damaging) occurrence. In its effort to avoid applying the clear precedent from our decision in *Frazier*, today's plurality opinion sidesteps the logical consequences of that decision by wrongly heightening the standing requirements for all Kansas parents in a

manner that elevates form over substance. The end result is an erosion of the legal protections afforded the parent-child relationship for all Kansans.

Justice Johnson's dissent likewise sidesteps *Frazier* in the other direction, ignoring statutory standing requirements in adoption cases—a view that would make adoption more difficult in the future by permitting nonparental persons extra-statutory standing to object. Justice Rosen's dissent has the powerful virtue of taking seriously and at face value both Grandmother's arguments and our *Frazier* decision. For this reason, I find myself in close affinity with his view. But in the final analysis, I cannot agree that Grandmother has lawful standing as a parent because I conclude that *Frazier*'s interpretation of the KPA was wrong and should be rejected. I will address each of today's opinions in turn.

> *Grandmother has made a prima facie claim of standing as a parent under controlling Kansas law.*

The plurality opinion rejects Grandmother's appeal because it concludes she does not have standing to object to the adoption or to pursue this appeal. Slip op. at 22. Generally, I agree with the plurality's interpretation of the relevant standing statutes and the underlying law governing standing. Grandmother must establish statutory standing. Slip op. at 10-11. She can do this one of three ways: either by establishing that she is (1) the petitioner in the case; (2) a person granted interested party status by the lower court; or (3) Thomas' parent. See slip op. at 13; K.S.A. 2016 Supp. 59-2401a(e)(7), (8). It is undisputed that Grandmother is neither the petitioner in this case nor was she granted interested party status below. This leaves only her claim to parental status.

The plurality opinion acknowledges that our precedent in *Frazier* establishes Grandmother could achieve the legal status of parent, sometimes referred to as a "de facto" parent, simply by entering into a contract with Mother in which Mother waived her

parental preference in favor of Grandmother and Grandmother agreed to co-parent Thomas with Mother. Slip op. at 15. The plurality acknowledges that Grandmother specifically alleged standing in the adoption case *as a parent* expressly relying on *Frazier* and the factual existence of a *Frazier* agreement with Mother. Slip op. at 14-15. Finally, the plurality acknowledges that Grandmother went beyond mere pleadings and allegations below by filing a verified brief which should be treated as evidence. Slip op. at 18-19. Justice Rosen's dissent more fully catalogues Grandmother's efforts to establish her standing as a parent under *Frazier* and to place in issue material facts that, if true, would support her claim. I agree with his dissent in this respect.

Despite these efforts, the plurality cuts off a party who has made a colorable parenthood claim (in fact and law) from participation in a matter that may fully and finally resolve the question of who, exactly, the law will recognize as Thomas' parents. The plurality does this, not on any substantive grounds, but with a procedural dodge that imposes on parents or would-be parents in adoption proceedings an "elevat[ed] . . . level of proof" and a heightened "burden of persuasion." Slip op. at 17-20.

The United States Supreme Court has long recognized the unique nature of the relationship between a parent and child. See *Parham v. J. R.*, 442 U.S. 584, 602, 99 S. Ct. 2493, 61 L. Ed. 2d 101 (1979) ("The law's concept of the family rests on a presumption that parents possess what a child lacks in maturity, experience, and capacity for judgment required for making life's difficult decisions."); *Wisconsin v. Yoder*, 406 U.S. 205, 232, 92 S. Ct. 1526, 32 L. Ed. 2d 15 (1972) ("The history and culture of Western civilization reflect a strong tradition of parental concern for the nurture and upbringing of their children. This primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition."); *Prince v. Massachusetts*, 321 U.S. 158, 166, 64 S. Ct. 438, 88 L. Ed. 645 (1944) ("It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function

26

and freedom include preparation for obligations the state can neither supply nor hinder."); *Meyer v. Nebraska*, 262 U.S. 390, 400, 43 S. Ct. 625, 67 L. Ed. 1042 (1923) ("[I]t is the natural duty of the parent to give his children education suitable to their station in life.").

We are told that a parent's interest in the care, custody, and control of his or her child is "perhaps the oldest of the fundamental liberty interests recognized by this Court." *Troxel v. Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000) (plurality opinion). So fundamental is this right that the State may not meddle with it absent a compelling countervailing protection interest. *In re Woodard*, 231 Kan. 544, 550, 646 P.2d 1105 (1982). Such a high regard for the parent-child relationship stems from a recognition that "[t]he child is not the mere creature of the state[.]" *Pierce v. Society of Sisters*, 268 U.S. 510, 535, 45 S. Ct. 571, 69 L. Ed. 1070 (1925). Parents and children form a relationship that "preexists government. This cherished and sacrosanct right 'is not a gift from the sovereign; it is our natural birthright. Fixed. Innate. Unalienable.' [Citations omitted.]" *In Interest of E.G.L.B.*, 342 Ga. App. 839, 848, 805 S.E.2d 285 (2017).

Given what is at stake in these cases, I find the additional and newly created procedural hurdles the plurality throws in litigants' paths unjustified. It is form-over-substance law making at its worst. See *State v. Tafoya*, 304 Kan. 663, 670, 372 P.3d 1247 (2016) ("'The law of this state is realistic. Substance prevails over form.'"); *State v. McCormick*, 305 Kan. 43, 53, 378 P.3d 543 (2016) (Stegall, J., dissenting) ("[E]mpty formalism ought to be avoided because it has a tendency to undermine confidence in the rule of law by unnecessarily providing ready examples to those who decry the 'technicalities' of the law.").

If Grandmother *truly* is Thomas' parent under prevailing Kansas law (something we will never know), she will now forever lose that status without even the basic dignity

27

of minimal legal protections. Other parents may likewise be required to satisfy the plurality's notion of a heightened burden of persuasion, further eroding legal protections for the parent-child relationship in Kansas. Why? Whatever the reason, the result is effected because a plurality of this court will not or cannot bring itself to either revisit or stand behind the consequences of our prior decisions.

*If she is not a parent, Grandmother does not have standing.*

Next, I must turn briefly to Justice Johnson's dissent. While I am clearly in sympathy with the equitable basis of that opinion, in my view equity is not a sufficient justification for this court to simply grant standing in an adoption case to a "legal-custodian-grandmother"—even if the desire to do so arises from our reservoir of wisdom or an abundance of caution concerning the best interests of the child.

Adoption is a creature of statute, and standing in an adoption case is strictly committed to the discretion of the Legislature. See *In re Adoption of H.C.H.*, 297 Kan. 819, Syl. ¶ 1, 304 P.3d 1271 (2013). I would not invade the prerogatives of that co-equal department of government by disregarding clear statutory dictates and requirements that are not met by a "legal-custodian-grandmother." See *Solomon v. State*, 303 Kan. 512, 546, 364 P.3d 536 (2015) (Stegall, J., concurring) ("Constitutional limits enforced under the protective umbrella of the rule of law derive their ultimate authority from the political power of the people and exist for the protection and propagation of liberty under the law. Each department of government has been vested with unique and exclusive powers to effectuate orderly government—and each has a coordinate and co-equal obligation to exercise its powers with due respect for the powers vested in the other branches.").

Like the plurality, Justice Johnson's dissent avoids grappling with the clear arguments of Grandmother and the consequences of our *Frazier* decision. He simply

dodges in the opposite direction. Unfortunately, just as heightening statutory standing requirements unfairly impacts the parties in this case and harms the legal protection given to the parent-child relationship in Kansas, so too does impermissibly watering down those same requirements. Applying Justice Johnson's rule, would-be adoptive parents may be prevented from completing an adoption by the intervention of nonparent third parties claiming extra-statutory standing. I cannot endorse such an approach.

*We should reconsider and reject* Frazier's *faulty interpretation of the KPA.*

Finally, Justice Rosen's dissent gets this case correct under current law. *Frazier* clearly construes Kansas law to create a pathway to parenthood independent of either biology or adoption, and based instead on contract principles. As Justice Rosen puts it, citing *Frazier*: "Grandmother has stated a prima facie case of standing based on Mother's waiver of the parental preference doctrine and her granting Grandmother the rights of a parent." Slip op. at 45. If I were to apply current law, I would simply join his dissent.

But the nature of the *Frazier* decision and the obvious confusion and havoc it has caused in this area of the law (on full display here) compel me to reconsider that decision's interpretation of the KPA. And a substantive review of *Frazier* demonstrates conclusively that our earlier interpretation of the KPA allowing parenthood-by-contract was wrong and should be rejected. As a consequence, on the substantive merits, Grandmother does not have legal grounds to assert the status of parent in this case.

This conclusion puts me in the unhappy position of having no choice but to concur in the result reached by the plurality. I recognize this result works an unfairness against Grandmother, who has relied on our prior precedent, and I understand the frustration expressed in Justice Johnson's dissent that this conclusion amounts to the "deciding vote" against Grandmother in a case in which I have acknowledged Grandmother has the better

29

argument under existing law. Slip op. at 49. But far from being a "ploy" or an "excuse for pontificating," slip op. at 49, I regard my decision as a confrontation with the old judicial dilemma that arises from the difficulty of trying to establish stability and predictability on the weak foundation of bad law. At the end of the day, it is often best to face up to past mistakes, stop building altogether, and seek firmer footings. In this way, the whole edifice might be saved from a more catastrophic collapse in the future when foundational weakness gives way to structural rot. Though Justice Johnson is correct that neither Mother nor Stepfather ask us to overrule *Frazier*, slip op. at 49, Grandmother's claim clearly and consistently invokes *Frazier*, putting the holding of that case squarely in play. So it is to *Frazier* that I now turn.

The parent-child relationship, and who can be or become a "parent" in Kansas, is defined by the KPA. K.S.A. 2016 Supp. 23-2205. Given Grandmother's claim to be Thomas' parent by virtue of a contractual agreement with his mother, the KPA is where our analysis must start. Ordinarily, we follow a well-defined and oft-stated analytical process for determining the meaning of statutes, beginning with the plain meaning of the words chosen by the Legislature. *Miller v. Board of Wabaunsee County Comm'rs*, 305 Kan. 1056, 1059, 390 P.3d 504 (2017). But *Frazier*'s holding—that the KPA means the opposite of what it plainly says—is not supported by anything resembling traditional statutory analysis. See *In re Tax Appeal of BHCMC,* 307 Kan. 154, 161, 408 P.3d 103 (2017).

In lieu of this deficiency, before turning to *Frazier*'s rationale, it behooves me to describe in some detail the plain meaning and overall structure of the KPA. To begin with, the KPA defines the "mother and child relationship" and the "father and child relationship" as the "legal relationship between a child and the child's *biological or adoptive* parents." (Emphasis added.) K.S.A. 2016 Supp. 23-2205. This foundational definition sets the framework for the entire statutory scheme. Under Kansas law, biology

30

and adoption are the only two ways a parent-child relationship can be forged, though as we will see, the law allows that because biology is not always obvious (especially paternal biology), the biological foundation for parenthood is necessarily one that can be arrived at through presumptions—that is, legally enforceable educated guesses.

I pause here to add an important sidebar. The parent-child relationship is created in Kansas not only through biology and traditional adoption, but also through what amounts to a statutorily created de facto or quasi-adoption that is available to parents who utilize assisted reproductive technologies (ART). See generally Kramer, *Where the Sidewalk Ends:  An Update to the Kansas Assisted Reproductive Technology Statute to Give All Children Legal Rights to Their Parents*, 54 Washburn L.J. 329, 345 (2015) (discussing and defining assisted reproductive technologies).

When parents in Kansas utilize ART in accordance with statutory guidelines, the nonbiological spouse who consents in writing to the procedure is automatically granted in law the rights and responsibilities of a parent-child relationship with the resulting child. That consent has the same effect "as adoption papers." K.S.A. 2016 Supp. 23-2303. And the child is given, by law, a status identical to "a naturally conceived child of the [married couple]." K.S.A. 2016 Supp. 23-2302. Or as Professor Elrod put it in her amicus brief to this court in *Frazier*, the "parent-child relationships resulting from ART are no different from those formed naturally or by adoption." Presumably, though Kansas law speaks in terms of "husband and wife," the opportunity to avail themselves of a de facto adoption through ART is necessarily extended to same-sex married couples pursuant to the United States Supreme Court's ruling in *Obergefell v. Hodges*, 576 U.S. ___, 135 S. Ct. 2584, 192 L. Ed. 2d 609 (2015); see also *Marie v. Mosier*, 196 F. Supp. 3d 1202, 1221 (D. Kan. 2016) (relying on *Obergefell* to enjoin the executive branch of Kansas from "treating same-sex married couples differently" than "opposite-sex married couples" when determining "the other rights, protections, obligations, or benefits of marriage").

31

The use of ART is, of course, a unique circumstance and is treated as such by the law. Returning to the KPA proper, because the parent-child relationship established by the KPA is a *legal* relationship with attendant rights and responsibilities, the remainder of the KPA is concerned with how, precisely, the relationship can be *established*—that is, proved up to the point of legal recognition.

Motherhood can be established "by proof of . . . having given birth to the child." K.S.A. 2016 Supp. 23-2207(a). In the absence of such proof, motherhood can be established "under this act." K.S.A. 2016 Supp. 23-2207(a). Likewise, fatherhood can be established "under this act," or in the alternative, by executing a "voluntary acknowledgment of paternity" form pursuant to K.S.A. 2016 Supp. 23-2204. K.S.A. 2016 Supp. 23-2207(b). Finally, either motherhood or fatherhood can be established by "proof of adoption." K.S.A. 2016 Supp. 23-2207(c).

The phrase "under this act" as used in K.S.A. 2016 Supp. 23-2207 can only refer to the process set forth in the KPA for resolving disputed parentage. The KPA allows any "child or . . . person on behalf of such a child" to bring an action to establish either fatherhood or motherhood. K.S.A. 2016 Supp. 23-2209(a). The legal mechanisms for determining fatherhood or motherhood in such circumstances are the "presumption[s] of paternity" (or maternity by virtue of K.S.A. 2016 Supp. 23-2220, which makes the presumptions equally applicable insofar as practicable to the establishment of motherhood) set forth in K.S.A. 2016 Supp. 23-2208. These presumptions include "acknowledg[ment] of paternity" and genetic testing that indicates a "probability of 97% or greater that the" person is either the father or mother. K.S.A. 2016 Supp. 23-2208(a)(3)-(5).

Key to understanding the meaning of the KPA—and K.S.A. 2016 Supp. 23-2208 in particular—is to understand the plain and ordinary meaning of the words *paternity* (or maternity) and *acknowledge*. Paternity means something more specific than just generic fatherhood. As used in the KPA, it clearly means *biological* fatherhood. Paternity is the "condition of being a father, esp. a biological one," and maternity is the "condition of being a mother, esp. a biological one." Black's Law Dictionary 1125, 1306 (10th ed. 2014). An adoptive father does not take a paternity test to establish fatherhood—to do so would be both futile and nonsensical. Legal fatherhood is broader than mere paternity.

Furthermore, to acknowledge something means to recognize it "as being factual." Black's Law Dictionary 27 (10th ed. 2014). The act of acknowledgment does not *make* something true or real. To acknowledge something is merely to accept and recognize as true a preexisting reality. Thus, one cannot *make oneself* into a father by acknowledgment. A person who makes a voluntary acknowledgment of paternity is not akin to a person taking a citizenship oath—a noncitizen immediately beforehand and a citizen immediately afterward. Rather, a person acknowledging paternity is a person who purportedly *already is* biologically related to a child and is merely availing himself of a presumption in favor of that preexisting condition. We explicitly made this point recently when we construed the meaning of "'acknowledgment of paternity'" to mean, citing Black's Law Dictionary, a "'father's public recognition of a child as his own.'" *State ex rel. Secretary of DCF v. Smith,* 306 Kan. 40, 49, 392 P.3d 68 (2017). One can only publicly recognize a fact that preexists the act of recognition. Recognition does not give birth to the fact.

Just as an adoptive father has no need of a paternity test, it would likewise be futile and nonsensical for him to attempt to establish fatherhood by a voluntary acknowledgment of paternity. Similarly, a voluntary acknowledgment of paternity must—by the plain meaning of the word acknowledge—be categorically unavailable to

33

one who affirmatively disclaims any biological relationship. In such a situation, what preexisting fact remains to acknowledge? An adoptive father has sidestepped biology altogether and thus has no need of presumptions. But adoption is the only end-run around biology contemplated by the KPA.

The ordinary meaning of the words chosen by our Legislature establishes that the presumptions of paternity in the KPA are aimed at determining whether a biological relationship exists. Further support for this plain language conclusion is found in the structure of the Act. The only nonadoptive methods for establishing parenthood apart from the presumptions are decisively grounded in biology (proof of birth or the execution of a voluntary acknowledgment of paternity pursuant to K.S.A. 2016 Supp. 23-2204). Thus, the KPA succeeds in creating a coherent whole by ending where it begins—that in Kansas, the exclusive routes to parenthood are biology and adoption.

This structure makes eminent sense when one considers the parenthood quandary created by biological realities. As the United States Supreme Court has said: "'The mother carries and bears the child, and in this sense her parental relationship is clear. The validity of the father's parental claims must be gauged by other measures.'" *Lehr v. Robertson*, 463 U.S. 248, 260 n.16, 103 S. Ct. 2985, 77 L. Ed. 2d 614 (1983) (quoting *Caban v. Mohammed*, 441 U.S. 380, 397, 99 S. Ct. 1760, 60 L. Ed. 2d 297 [1979] [Stewart, J., dissenting]). When explaining why facially neutral rules for establishing parenthood might in fact require different things of fathers and mothers, the Supreme Court noted that "[g]iven the proof of motherhood that is inherent in birth itself, it is unremarkable that Congress did not require" mothers to take the "same affirmative steps" for establishing parenthood as fathers must take. *Tuan Anh Nguyen v. INS*, 533 U.S. 53, 64, 121 S. Ct. 2053, 150 L. Ed. 2d 115 (2001).

"Given that the mother is always present at birth, but that the father need not be, the facially neutral rule would sometimes require fathers to take additional affirmative steps which would not be required of mothers, whose names will appear on the birth certificate as a result of their presence at the birth, and who will have the benefit of witnesses to the birth to call upon." 533 U.S. at 64.

The "affirmative steps" created and mandated by the KPA are what create the "presumptions of paternity." It is vital to observe that according to the KPA, even these affirmative steps are only presumptions. They can be rebutted. See K.S.A. 2016 Supp. 23-2208(b). And crucially for our understanding of the KPA is the fact that when "two or more presumptions . . . arise which conflict with each other, the presumption which on the facts is founded on the weightier considerations of policy and logic, including the best interests of the child, shall control." K.S.A. 2016 Supp. 23-2208(c). The KPA has included this provision since its inception. K.S.A. 38-1114 (Ensley 1986); see Uniform Parentage Act § 4, 9B U.L.A. at 394 (2001).

Why does the law require a choice between presumptions? There is one, logically inescapable answer—because the KPA recognizes only a *biological* presumption, and biology dictates that there can only be one biologically established father and one biologically established mother. If the presumption were more broadly construed to merely indicate generic parenthood, there would be no clear need to require that only one presumption can be valid and enforceable.

Applying this plain language interpretation of the KPA to Grandmother's claim to be Thomas' parent, I am forced to the following conclusions. First, we know Grandmother is not Thomas' birth mother. We therefore also know that she cannot execute a voluntary acknowledgment of maternity pursuant to K.S.A. 2016 Supp. 23-2204 because Grandmother does not dispute that maternity has already been

35

conclusively established in Thomas' mother. We know none of the biological presumptions set forth in K.S.A. 2016 Supp. 23-2208 apply because Grandmother does not claim biological maternity of Thomas, and even if she did, the biological maternity of Thomas is already indisputably established. Finally, we know that Grandmother has not adopted Thomas. As a matter of the plain language of the KPA, this should end our substantive inquiry into whether Grandmother—even after resolving all disputed facts in her favor—can sustain a legal claim to parenthood in this case. She cannot.

But our decision in *Frazier* says she can. *Frazier* entailed complicated facts and considerations of policy not present in Thomas' case. Still, for our purposes, the core facts are similar—*Frazier* involved a known biological mother contesting the parental rights of another woman who claimed those rights through neither biology nor adoption.

The biological mother in *Frazier* argued that the third party simply could not be a mother because she did not ground her claim in either biology or adoption. We disagreed, discovering instead a heretofore hidden parenthood-by-contract pathway in the KPA thicket. Importantly, we injected a subtle shift of meaning into the analysis by characterizing the mother's claim as being "that known biological lineage always and definitively trumps any statutory *presumption of parenthood*." (Emphasis added.) *Frazier*, 296 Kan. at 737. The problem with this statement is that it creates and then purports to interpret and apply a mythical statute that does not exist. There is simply no such thing as a presumption of parenthood in Kansas law. There is only a presumption of *paternity* or *maternity*. As has already been demonstrated, these are significantly narrower categories than the broader, generic category of parenthood.

By misstating the law this way, the *Frazier* court impermissibly broadened the meaning of K.S.A. 2016 Supp. 23-2208 to include presumptions entirely severed from biology—a broadening that resulted in an interpretation of the statute directly contrary to

36

its plain meaning. Having ignored the plain meaning of paternity and the importance of that word, the *Frazier* court concluded:

> "Obviously, . . . the parental relationship for a father [or mother] can be legally established under the KPA without the father [or mother] actually being a biological or adoptive parent. . . . A harmonious reading of all of the KPA provisions indicates that a female can make a colorable claim to being a presumptive mother of a child without claiming to be the biological or adoptive mother." 296 Kan. at 746-47.

This amounts to an elaborate judicial exercise in putting the cart before the horse. The observation that the biological presumptions set forth in the KPA can be wrong is a non sequitur. Of course the presumptions can be wrong—so what? The *Frazier* court apparently reasoned as follows: because it is possible for a person who is not, factually speaking, the biological parent of a child to nonetheless be recognized as the child's parent, the presumption must be available to anyone claiming *ontological* parenthood as opposed to mere paternity or maternity.

Therefore, one need only claim to be a "parent" (for example, by virtue of a contract with a person who is already the child's parent) in order to take advantage of the presumptions contained in K.S.A. 2016 Supp. 23-2208. And one of the presumptions is a voluntary acknowledgement. Armed with evidence of a de facto parent contract and this air-tight circular reasoning, a mere third party with no claim to either a biological relationship or an adoptive one can be transformed by the KPA and this court into a parent. Forgotten is the clear statutory statement that the parent-child relationship is exclusively defined as the "legal relationship existing between a child and the child's *biological or adoptive* parents." (Emphasis added.) K.S.A. 2016 Supp. 23-2205.

But one cannot determine the factual content of a presumption by looking at the conclusion it generates and reasoning backwards. This is a subtle variation of the fallacy logicians call affirming the consequent. See Rice, *Conspicuous Logic: Using the Logical Fallacy of Affirming the Consequent as a Litigation Tool*, 14 Barry L. Rev. 1, 6-7 (2010). Just because the law permits the establishment of a parent-child relationship based on a presumption that *in actual fact* is wrong does not—cannot—operate as a post hoc alteration of the *factual content* the law is purporting to presume in the first place. Indeed, there are good policy justifications the Legislature may have had for deciding that it is better for the law to recognize fatherhood in people who actually claim and have a presumption of paternity than it is to leave a child fatherless simply because the presumption might be a weak one, or even incorrect.

Nevertheless, the *Frazier* court made the leap from the legal fiction that the law might by necessity recognize a person as a biological parent who really is not, to the conclusion that "harmony" requires us to ignore the plain meaning of "paternity" along with the statutory limitation of parenthood to either biology or adoption. Because I can discern no harmonizing of conflicting statutory provisions in the *Frazier* analysis, I presume the *Frazier* majority simply harmonized the KPA with its own notions of parenthood. In so doing, *Frazier* vitiated the entire structure and purpose of the KPA, all of which is designed with great precision to limit parenthood to those who "claim" that status by virtue of either biology or adoption. Just because such claims might be recognized even when wrong does not undermine the statutory mandate that the claim be made.

At this stage of the analysis, it is important to point out that neither these conclusions nor the KPA itself precludes two persons of the same sex from both becoming parents to the same child. The statutory framework is entirely free from any legislative effort to answer the policy questions concerning what kinds of familial

38

relationships the law will recognize. In particular, there is nothing in the KPA that precludes a child from having two father-child relationships or two mother-child relationships. These parental arrangements can arise fully compliant with statute through either traditional adoption or through the de facto adoptions facilitated by our statutory scheme governing ART. The KPA merely says a child cannot have two such relationships based on either paternity or maternity. A fact the birds and the bees know but the *Frazier* court seemed to forget.

A subsequent decision of this court may appear to have cemented in law this counterintuitive interpretation of the KPA. In *State ex rel. Secretary of DCF v. Smith,* 306 Kan. 40, 392 P.3d 68 (2017), cited above, we correctly interpreted the meaning of an acknowledgment of paternity, but in dicta, we carried forward *Frazier*'s confused logic. We quoted *Frazier*'s statement that "the parental relationship for a father can be legally established under the KPA without the father actually being a biological or adoptive parent." 306 Kan. at 56. Thus, we concluded, an acknowledgment of paternity "sets up a situation by which an individual may become a legal parent even though not a biological or adoptive one." 306 Kan. at 56. While technically true, this unfortunate line of dicta led us to repeat the faulty conclusion that because a factually erroneous acknowledgement of paternity can operate by law to establish a parent-child relationship, this necessarily means that the KPA provides a path for people who do not claim either biological or adoptive parenthood to nonetheless be parents.

Indeed, we made the self-contradicting statement in *Smith* that the KPA does not "limit the availability of the [voluntary acknowledgment of paternity] procedure to those who are, or reasonably believe themselves to be, biological parents" because the statute and the form used by the Office of Vital Statistics does not require "a person who signs the form to make a declaration of biological parenthood." 306 Kan. at 56. But as I have already demonstrated, an acknowledgment of *paternity* (or maternity) is in fact a

39

"declaration of biological parenthood." Here, *Smith* makes the same mistake *Frazier* made—assuming that because the declaration of biological parenthood can be enforced even when wrong must mean that biological parenthood is not what is being declared.

It is instructive to consider the actual facts and limited holding of *Smith*. Smith had executed a voluntary acknowledgment of paternity pursuant to K.S.A. 2016 Supp. 23-2204. Much later, after the state acted to enforce his financial obligations to the child, Smith tried to revoke the VAP by disavowing paternity. We held, in an opinion I joined, that the ability to revoke a voluntary acknowledgment of paternity is strictly controlled by statute and that given the circumstances of the case, Smith was procedurally foreclosed from revoking his prior acknowledgment of paternity even if he possessed good evidence rebutting actual paternity.

"An individual who signs a K.S.A. 2016 Supp. 23-2204 voluntary acknowledgment of paternity may only revoke the acknowledgment by satisfying the requirements in K.S.A. 2016 Supp. 23-2209(e). If those requirements are not timely satisfied, those who executed the document cannot attempt to revoke the acknowledgment, attempt to rebut the presumption of paternity that arises from the acknowledgment, or attempt to establish the existence of a conflicting presumption through, for example, genetic testing." 306 Kan. 40, Syl. ¶ 3.

This holding remains sound and provides an example of both the proper plain language interpretation of the KPA and the legislative policy considerations discussed above. The acknowledgment in *Smith* was an acknowledgment of biological fatherhood. The facts as developed later made it pretty clear Smith was not the biological father. See 306 Kan. at 43. Essentially, Smith either lied or was deeply confused when he signed the form. In so doing, Smith conceived a fiction permitted by the law (paternity) which grew and blossomed into a legally enforceable fact (fatherhood) which then matured into an

irrevocable reality (a permanent father-child relationship). The legislative policy preferences permitting this outcome are clear, and it is not our place to alter them. We recognized this in *Smith* and simply enforced the plain meaning of the law written by the Legislature. 306 Kan. at 51 ("""[Q]uestions of public policy are for legislative and not judicial determination, and where the legislature does so declare, and there is no constitutional impediment, the question of the wisdom, justice, or expediency of the legislation is for that body and not for the courts.""") (quoting *State v. Spencer Gifts*, 304 Kan. 755, 765, 374 P.3d 680 [2016]).

I do not question the holding of *Smith*. In hindsight, I do regret the erroneous statements made in dicta that carry forward the ill-considered aspects of our *Frazier* decision. Grandmother now relies on decisions like *Frazier* and *Smith* to conclude that in Kansas, a person can legally become a parent simply by privately contracting with an existing parent. For example, relying on this caselaw, Grandmother claims that "Natural Mother does not hold 'full title' to . . . parental rights [over Thomas] because she share[d] equal rights" with Grandmother. Similarly, the Amicus National Association of Grandparents urges that Grandmother "has had an agreement with [Mother] to co-parent" and thus "was given the status of parent . . . by [Mother] and by the state of Kansas." Amicus goes on to argue that to refuse to acknowledge the legitimacy of these agreements under *Frazier* "casts an ominous cloud over all voluntary arrangements for parenting" and encourages the use of "the adoption process as contract rescission."

I am left to wonder, when did Kansas recognize "title" to children and render them proper objects for contractual trade? Long ago, Justice Brewer, writing for this court, articulated the fundamental manner in which the parent-child relationship is rooted in the "law of nature." *Chapsky v. Wood*, 26 Kan. 650, 652 (1881). As such, the positive law protects what we have come to call the "parental preference" which is described as "a fundamental right . . . to the care, custody and control of [the parent's] child." Slip op. at

41

15 (quoting *Sheppard v. Sheppard*, 230 Kan. 146, 154, 630 P.2d 1121 [1981]). Justice Brewer recognized, however, that this parental preference "is not like the right of property" which would render "a child . . . like a horse or any other chattel, subject-matter for . . . gift or contract." *Chapsky*, 26 Kan. at 652-53.

Today's plurality appears unfazed by the trend toward viewing the parent-child relationship through the contract law lens. It acknowledges one of the central holdings and rationales of *Frazier*: "the parental preference can be waived" and then "shared by agreement with a third party—that is, someone other than the biological or adoptive parent." Slip op. at 15. This innocuous sounding declaration is nothing short of a revolution in societal norms that have for centuries firmly rejected the commodification of children. Here I must be clear—the *Frazier* court and today's plurality is saying that in Kansas, the prevailing law dictates that a parent in relation to a child possesses a discreet, property-like thing called a "parental preference" which is divisible and can be "contracted" away to a third party, thus conferring on that third party an equal parental preference which transmogrifies the third party into another lawful parent of the child. What are the limiting principles governing these transactions? We do not know.

What *Frazier* did make clear is that in Kansas, the parent-child relationship is a good to be traded like "any other chattel." See *Chapsky*, 26 Kan. at 652-53. Perhaps *Frazier* never envisioned an actual material exchange during these transactions. Our inexplicable hesitancy to enforce the holding of *Frazier* in this case may indicate a level of discomfort with such "parental sharing" contracts when they occur outside the confines of a committed romantic relationship. If so, this simply underlines *Frazier*'s reckless naiveté. In truth, I have no doubt the *Frazier* court believed it was making a more modest proposal—that the responsibility to care for children can be shared with people who are neither biological nor adoptive parents and the law ought to find a way to recognize this when it is in the best interests of the child. In fact, this is the sum and substance of

42

Grandmother's claim today. Whether this would be good policy or bad, it is not our place to decide.

Because *Frazier* ignores the plain meaning of the KPA, defies logic, and makes children into objects of trade, I would reject its interpretation of the KPA. Instead, relying on the plain language of the statute and our traditional tools of statutory interpretation, I would hold that because Grandmother does not claim biological maternity or adoptive parenthood over Thomas, she simply cannot be recognized as Thomas' parent under Kansas law.

We broke the KPA in *Frazier*. Today we refuse to buy the consequences of that decision. Therefore, while I concur in result, I dissent from the substantive portions of each of the three other separate opinions issued today.

* * *

ROSEN, J., dissenting:  For most of T.M.M.H.'s life, T.M.M.H. has been the subject of court proceedings in which co-parenting agreements and court orders involving Mother and paternal grandmother have established the parental responsibilities that have secured T.M.M.H.'s care and welfare. As a result, Judge Kelly Ryan, the judge then presiding over that case, addressed issues potentially relevant to this case, including Grandmother's status and Mother's exercise of her parental preference. While these findings were made following oral arguments in this case and will almost certainly be subject to appeal based on the Rule 6.09 letters filed, the probate/adoption court's refusal to recognize the dynamics of the parental role established by Grandmother in an over eight-year ongoing companion case occurring under the same courthouse roof and to appreciate how these two proceedings may impact each other is inexcusable. The majority validates this judicial dysfunction by affirming that a stepparent adoption under

these circumstances is a procedural mechanism that can bar a person who achieves the status of parent, both in fact and in law, from even being heard before potentially being cut out of their child's life.

Further, I join Justice Johnson's assessment of Justice Stegall's concurring opinion. By utilizing this case at this juncture in the proceedings to express his displeasure with *Frazier* and impose his narrow construction of the Kansas Parentage Act (KPA), K.S.A. 2016 Supp. 23-2201, his concurring opinion actually creates more instability in T.M.M.H.'s life than his approach purports to cure. While his construction may provide some measure of legal certainty, it does so at the expense of T.M.M.H.'s real world attachments and established parental bonds.

Notwithstanding the concerns expressed above, based on the record properly before us I would hold that the district court erred in ruling Grandmother lacked standing and the Court of Appeals erred in affirming that decision. See *In re Adoption of T.M.M.H.*, No. 115,309, 2016 WL 7032112, at *6 (Kan. App.) (unpublished opinion). Grandmother's allegations present a prima facie basis for her standing as a parent. See K.S.A. 2016 Supp. 59-2401a(e)(1). Consequently, the district court should have conducted an evidentiary hearing to determine whether Grandmother could sustain her burden, and I would remand for that determination.

*Statutory Standing*

In Grandmother's verified brief, she primarily argued standing based on her status as legal custodian. Grandmother also attached some records from the grandparent visitation case in support of her standing. Through these means, she included the following facts suggesting her status is that of parent:  Grandmother had custody of T.M.M.H., either by court order or Mother's agreement, for much of his life and served as

44

his primary caregiver and source of financial support. In 2010, Grandmother agreed to share custody with Mother. Grandmother provided different descriptors for her relationship with Mother and the child. Importantly for this analysis, Grandmother sometimes described the relationship with Mother as one of "co-parents." Grandmother further asserted her "co-equal status as parent" was litigated and resolved in the grandparent visitation case. She referred to various agreements between her and Mother by using different names, including "settlement agreement," "parenting plan," "Amended Parenting Plan," and "Amended Mediated Parenting Plan." Grandmother also referred to herself as having a primary attachment bond with the child and as a "de facto parent."

In addition, the record on appeal includes evidence from the grandparent visitation case. Grandmother attached a Journal Entry and Order, which provides Mother and Grandmother with "joint legal custody" of the child and retains for the court the authority to make decisions concerning custody when the parties are unable to do so. As the Court of Appeals panel concluded, the only place Kansas statutes use of the phrase "joint legal custody" is in divorce cases when two parents share custody of a child. *In re Adoption of T.M.M.H.*, 2016 WL 7032112, at *3 (citing K.S.A. 2015 Supp. 23-3206[a]). Viewing this use of "joint legal custody" in the light most favorable to Grandmother, one may infer the judge presiding over the visitation case recognized mother had waived the parental preference doctrine and the parties were required to share parenting responsibilities. The order offers further support for such an inference, allocating "parenting time" between the women—as opposed to granting visitation to Grandmother solely on the basis of her status as a grandparent.

I appreciate the facts presented here are distinguishable from previous cases dealing with the establishment of nontraditional parental rights and may ultimately lead to a different legal conclusion. However, at this juncture, viewing the evidence in the light most favorable to Grandmother, Grandmother has stated a prima facie case of

standing based on Mother's waiver of the parental preference doctrine and her granting Grandmother the rights of a parent. See, e.g., *Frazier v. Goudschaal*, 296 Kan. 730, 753, 295 P.3d 542 (2013); 296 Kan. at 756-58 (Biles, J., concurring); *In re Marriage of Nelson*, 34 Kan. App. 2d 879, 884, 125 P.3d 1081 (2006).

Stepfather opposes these characterizations of the relationship between Mother and Grandmother. But Stepfather offered only briefing, not evidence, to the district court. Unlike Grandmother, Stepfather did not verify his brief. Nor did he attach any exhibits. Like Grandmother, he cited to the record of the grandparent visitation case without actually submitting any of those documents into the record. Stepfather attempted to rectify the issue on appeal, submitting some of the documents from the prior proceedings as attachments to his supplemental brief in this case. But an attachment to a brief does not become part of the record. Supreme Court Rule 6.02(b) (2018 Kan. S. Ct. R. 35) ("The appendix is for the court's convenience *and is not a substitute for the record itself*." [Emphasis added.]); Supreme Court Rule 6.03(b) (2018 Kan. S. Ct. R. 35); see also *State v. Warren*, 302 Kan. 601, 614, 356 P.3d 396 (2015) (court would not consider documents appended to brief but never formally introduced as evidence or added to record); *Rodriguez v. U.S.D. No. 500*, 302 Kan. 134, 144, 351 P.3d 1243 (2015) (court would not rely on appendix to brief not part of the record below). We cannot consider those documents at this time because they are not properly before us.

Considering these allegations and the evidence in the light most favorable to Grandmother at this stage of the proceedings, I would conclude the district court erred in ruling against Grandmother on the issue of her standing.

*Common-law standing*

Having reached this conclusion, I must also consider whether Grandmother can establish her common-law standing. *Sierra Club v. Moser*, 298 Kan. 22, 32-33, 310 P.3d 360 (2013). A person asserting standing bears the burden of establishing he or she has a cognizable injury, or injury in fact, and the causal connection between the injury and challenged conduct. *Gannon v. State*, 298 Kan. 1107, 1123, 319 P.3d 1196 (2014).

In arguing that she has a cognizable injury, Grandmother expresses her fears that a stepparent adoption here "dilut[es] the value of the custodial order" granted in the other case or "will modify and possibly remove her custodial rights." The potential for competing determinations by different judges certainly exists.

In addition, if Grandmother is deemed a parent, the stepparent adoption may have an impact on her rights. The statutory scheme for stepparent adoption appears to contemplate only two parents participating as parents in a child's life after the adoption— the birth parent-spouse and the stepparent. See K.S.A. 59-2118; K.S.A. 2016 Supp. 59-2129. Upon a stepparent adoption, the rights of the parent who is not a party to the stepparent adoption cease. See K.S.A. 59-2118(b) ("The adoptive parent shall be entitled to exercise all the rights of a birth parent and be subject to all the liabilities of that relationship. Upon adoption, all the rights of birth parents to the adopted person, including their right to inherit from or through the person, shall cease, except the rights of a birth parent who is the spouse of the adopting parent."). Because granting a stepparent adoption could terminate any parental rights of Grandmother, she may establish a cognizable injury. Accordingly, Grandmother may establish common-law standing and certainly has made out a prima facie case for such standing.

Because Grandmother has made a prima facie case for standing, I would reverse the district court and Court of Appeals decisions and would remand this case to the district court for further proceedings to determine whether Grandmother can sustain her burden to present evidence of her standing.

* * *

JOHNSON, J., dissenting:  I dissent from the majority's conclusion that a grandmother, who has had custody of her grandchild from a tender age pursuant to both a co-parenting agreement with the child's sole-surviving biological parent and an order from a district court, does not have standing to participate in a stepparent adoption proceeding. While the majority disposes of the case by attacking the lawyering skills of Grandmother's attorney, I submit that we know enough from the record to discern that Grandmother has a legitimate claim to being an interested person in these proceedings. Accordingly, we should reverse the district court's summary dismissal of the grandmother from the proceedings and order it to conduct an evidentiary hearing as to her status, so that it can acquire all of the relevant evidence it should have to fairly and justly rule on the adoption petition. Additionally, I would not reject Grandmother's new arguments in support of her standing on procedural grounds unrelated to standing. See *Mid-Continent Specialists, Inc. v. Capital Homes*, 279 Kan. 178, Syl. ¶ 2, 106 P.3d 483 (2005) ("Standing is a jurisdictional issue. An objection based on lack of subject matter jurisdiction may be raised at any time, whether it be for the first time on appeal or even upon the appellate court's own motion.").

Moreover, one might discern some gamesmanship by the biological mother, using a stepparent adoption proceeding to circumvent the best-interests-of-the-child rulings by another district judge in an open case. I would not reward that tactic, at the possible

48

expense of the child's physical, psychological, and emotional well-being. This really should not be about the adults' wants and needs.

I also think it is important to clarify whose custody is in play in the proceedings that are before us now. The Court of Appeals made the declaration: "[E]ven if the record had fully supported Grandmother's claim that her status as a joint legal custodian of the child generally gives her the right to make decisions in the best interests of the child, that right must yield to the conflicting right of the fit Mother." *In re Adoption of T.M.M.H.*, No. 115,309, 2016 WL 7032112, at *8 (Kan. App. 2016) (unpublished). But, here, a stepfather is seeking to become a legal parent of T.M.M.H.; and the grandmother wants to challenge that addition of another legal parent for the child. The biological mother's custody is not in issue in the adoption proceeding; and the grandmother's entry of appearance in the adoption proceeding cannot take away Mother's custody, it can only affect Stepfather's legal status. Viewed in the light most favorable to the biological mother, what we have here is a fight between third persons, a nonadoptive grandmother versus a nonadoptive stepfather. Yet, the majority apparently embraces the panel's reliance on the parental preference doctrine by declaring that Grandmother failed in her burden to establish standing in part because her "verified statements do not assert that Mother voluntarily and knowingly waived her parental preference." Slip op. at 18-19. Again, Grandmother seeks standing to challenge the stepfather's potential acquisition of parental rights; she does not seek standing to change Mother's existing parental rights.

Likewise, the custody disputes in *Frazier v. Goudschaal*, 296 Kan. 730, 295 P.3d 542 (2013), and *In re Marriage of Nelson*, 34 Kan. App. 2d 879, 125 P.3d 1081 (2006), both involved a biological mother asserting custodial rights against a nonbiological, nonadoptive person. And again, here, Mother is not asserting her custodial rights, but rather she is advocating for the potential parental rights of her husband. In short, allowing

a legal-custodian-grandmother to participate in a stepparent adoption case does no harm to the constitutional rights of the mother.

Pointedly, Stepfather's response to grandmother's petition for review does not ask this court to reverse the decision in *Frazier*. To the contrary, Stepfather insists that "[t]he situation in this appeal is in no way comparable to *Frazier*, for so many reasons." Consequently, we do not have the benefit of briefing on the efficacy of *Frazier*'s holdings, because Stepfather says they simply do not apply to his case. Likewise, the parties have been deprived of an opportunity to be heard on the question of why this court should jettison the doctrine of stare decisis—especially in light of legislative inaction in the five years since *Frazier*—simply because the composition of the court has changed.

Nevertheless, the author of the concurrence uses this case as a vehicle to vent his displeasure with the decision in *Frazier*. That is certainly his right. But what concerns me is that concurring with the majority appears to be the excuse for pontificating on *Frazier*, when it was not challenged by the parties. And the result of that ploy is that the concurrence is casting the deciding vote that will likely sever the child's relationship with his grandmother. In the vernacular of the concurrence: "Poor Thomas."

In *Frazier*, we related the information contained in the amicus curiae brief of the National Association of Social Workers that "the formation of attachment bonds is critical to a child's healthy development; . . . attachment relationships develop despite the absence of a biological or legal connection between parent and child; . . . and . . . children experience severe emotional and psychological harm when their attachment relationships are severed." 296 Kan. at 743. Grandmother's petition for review recites as a fact that the then 10-year-old T.M.M.H. had lived with her for the child's entire life, except for 60 days in 2008. Certainly, that raises the distinct likelihood that attachment bonds, critical to T.M.M.H.'s healthy development, had been formed with his

50

grandmother, the termination of which might cause the child to experience severe emotional and psychological harm. Accordingly, I would allow Grandmother to make her case for being an interested person in the adoption proceedings.

BEIER, J., joins in the foregoing dissenting opinion.