NOT DESIGNATED FOR PUBLICATION

Nos. 122,730
123,435

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interests of M.L., T.L., D.L., A.L., and M.M.,
Minor Children.

MEMORANDUM OPINION

Appeal from Geary District Court; COURTNEY D. BOEHM, judge. Opinion filed December 18, 2020. Affirmed.

*Angela M. Davidson*, of Wyatt & Davidson, LLC, of Salina, and *Anita S. Kemp*, of Wichita, for appellant natural father.

*Michelle L. Brown*, assistant county attorney, for appellee.

Before ARNOLD-BURGER, C.J., BUSER and WARNER, JJ.

PER CURIAM: In this consolidated appeal, M.L. (Father) appeals the district court's order terminating parental rights to five of his children, M.L. II, T.L., D.L., A.L., and M.M (the children). Specifically, Father challenges the district court's findings that he is unfit and that it is in the children's best interests to terminate his parental rights. We hold the district court's finding of parental unfitness is supported by clear and convincing evidence, and it was not an abuse of discretion to terminate Father's parental rights. Accordingly, we affirm the district court's judgment.

1

In November 2017, Father and L.M. (Mother) lived in a motel room with five children. Mother had a 13-year-old child from a previous relationship. Father had a six-year-old, a three-year-old, and a two-year-old from a previous relationship. Mother and Father had one child together, a one-year-old. Father and Mother were the primary parents for all five of the children.

On November 8, 2017, Kristina Blanck—a caseworker from St. Francis Community Services (SFCS)—reported to the Department for Children and Families (DCF) that she suspected two of Father's children had been sexually abused. Junction City Police Sergeant Douglas Cathey was assigned to investigate the matter. Blanck told Sergeant Cathey that she originally started working with the family based on concerns that Mother's 13-year-old son had physically and sexually abused Father's 6-year-old son. SFCS put a care plan in place with Father to ensure the children were not left alone with Mother's son. During this conversation, Blanck also advised Sergeant Cathey that Mother was pregnant with Father's child and was due anytime.

That same day, Sergeant Cathey went to the motel where the family was staying but no one answered when he knocked on the motel room door. Sergeant Cathey then called Father to advise him of the sexual abuse allegations and to request a meeting for the following day or the day after to talk about the concerns. Father told Sergeant Cathey he would meet with Cathey sometime the next day. Afterward, Sergeant Cathey contacted Caitlin Todd from DCF and learned that the agency planned to interview the children the following week.

Father and Sergeant Cathey did not meet in the following days as planned. Sergeant Cathey called and left Father a message but Father did not return the call.

On November 13, 2017, Todd called Sergeant Cathey to inform him that Father and Mother were at the hospital for delivery of the new baby and had left the 13-year-old at the motel to care for the 6-year-old, the 3-year-old, the 2-year-old, and the 1-year-old. Another detective responded to the motel room and found the five children alone as described. All of the children were taken into police protective custody. Later that day, Mother gave birth to M.M. Both Mother and M.M. tested positive for methamphetamine and amphetamines.

Two days after the children were taken into protective custody, the State filed a child in need of care (CINC) petition for each child on grounds that the children were without adequate parental care; without the care or control necessary for the children's physical, mental, or emotional health; and likely to sustain harm if not immediately removed from Father's care. At a temporary disposition hearing held the next week, the court placed the children in DCF custody. The matter was referred to SFCS, and a case plan was developed with the goal of reintegration.

It appears that the district court held a review hearing on January 10, 2018, and appointed a guardian ad litem on April 20, 2018, to represent the children. On May 30, 2019, the court held an adjudication and disposition hearing. Father, Mother, and the guardian ad litem submitted a statement of no contest to the allegations in the petition. In its journal entry of the hearing, the court found the children to be children in need of care and ordered the children to remain in DCF custody in out-of-home placement.

The district court held a permanency hearing on July 11, 2018. While the record on appeal does not contain any journal entry memorializing this hearing, it appears the court found reintegration was still a viable option. But at the permanency hearing held on November 28, 2018, the court determined reintegration was no longer viable. The court then held permanency hearings on December 12, 2018, February 20, 2019, and April 24, 2019.

3

Before the permanency hearing began on April 24, 2019, the State filed a motion to terminate Father's parental rights. The State alleged that Father was unfit as a parent based on the failure of reasonable efforts made by DCF to rehabilitate the family and a lack of effort by Father to adjust his circumstances, conduct, or condition to meet the needs of his children. See K.S.A. 2019 Supp. 38-2269(b)(7), (b)(8). The State also alleged a presumption of unfitness applied because the children had been in court-ordered out-of-home placement for more than a year and because Father substantially neglected or willfully refused to carry out the reasonable court-approved reintegration plan. See K.S.A. 2019 Supp. 38-2271(a)(5).

The termination hearing was held on July 8, 2019. At the beginning of the hearing, Mother's counsel informed the district court that Mother wanted to voluntarily relinquish her rights to her now 15-year-old son from a previous relationship and to her now 3-year-old and 1-year-old children she shared with Father. The court proceeded to hear evidence regarding whether Father's parental rights should be terminated.

After hearing the evidence and considering the parties' arguments, the district court determined Father was unfit under K.S.A. 2019 Supp. 38-2269(b)(7), (b)(8), and K.S.A. 2019 Supp. 38-2271(a)(5). The district court's findings emphasized that Father had "not presented to the Court a reasonable plan to show how the children would be reintegrated back into his home. He's presented no real plan to improve the stability that has been a consistent issue in these cases." Ultimately, the court determined that it was in the best interests of the children to terminate Father's parental rights.

The district court issued journal entries in the cases, finding by clear and convincing evidence that Father was unfit, the conditions rendering him unfit were unlikely to change in the foreseeable future, and it was in the children's best interests to terminate Father's parental rights.

Father filed a timely appeal which inadvertently included only four children, M.L. II, T.L., D.L., and A.L. After briefing, newly-appointed counsel for Father discovered the omission and moved for a stay of the issuance of our opinion to allow for an out-of-time filing of an appeal relating to M.M. and consolidation with the earlier appeal. After a hearing, the district court permitted the filing of an out-of-time appeal as to M.M. Our court docketed the appeal as to M.M. and ordered consolidation of both appeals under the above-captioned case and number. The matter is now submitted for decision as to all five children.

ANALYSIS

On appeal, Father argues there is insufficient evidence to support the district court's finding that he is unfit and that it was in the best interests of the children to terminate his parental rights.

1. *Unfitness*

Father asserts the standard of review in a termination of parental rights case is whether substantial competent evidence in the record supports the district court's finding that the parent is unfit. In support of this assertion, Father relies on *In re A.N.P.*, 23 Kan. App. 2d 686, 692, 934 P.2d 995 (1997). But in *In re B.D.-Y.*, 286 Kan. 686, Syl. ¶ 4, 187 P.3d 594 (2008), our Supreme Court modified the standard of review from *In re A.N.P.* The standard in place for the last 12 years requires the appellate court to determine whether clear and convincing evidence supports the district court's finding of unfitness. 286 Kan. at 705 (modifying standard of review for fact-finder determinations required to be "based upon clear and convincing evidence [to] one similar to that applied to sufficiency questions in criminal cases"). More specifically, when reviewing a finding of parental unfitness, this court must determine, after reviewing all the evidence in a light most favorable to the State, whether a rational fact-finder could have found the

5

determination to be highly probable, i.e., by clear and convincing evidence. See 286 Kan. at 705-06. In making this determination, the appellate court does not weigh conflicting evidence, pass on the credibility of witnesses, or redetermine questions of fact. 286 Kan. at 705.

Under K.S.A. 2019 Supp. 38-2269(a), the State is first required to prove a parent "is unfit by reason of conduct or condition which renders the parent unable to care properly for a child and the conduct or condition is unlikely to change in the foreseeable future." The statute provides district courts with a nonexclusive list of nine factors to consider when determining unfitness, and four more factors for the district court to consider when, as here, the parent does not have physical custody of the child. K.S.A. 2019 Supp. 38-2269(b), (c). Clear and convincing evidence of a single statutory factor under K.S.A. 2019 Supp. 38-2269(b) or (c) can be a sufficient basis for a district court's determination that a parent is unfit. K.S.A. 2019 Supp. 38-2269(f).

Although it did not expressly identify the subsections of the statute upon which it based its decision, the district court's ruling indicates that it relied on two statutory factors to support its finding that Father was unfit:  (1) failure of reasonable efforts made by DCF and SFCS to rehabilitate the family as set forth in K.S.A. 2019 Supp. 38-2269(b)(7), and (2) lack of effort on the Father's part to adjust his circumstances, conduct, or conditions to meet his children's needs as set forth in K.S.A. 2019 Supp. 38-2269(b)(8). In addition, the court found a statutory presumption of unfitness as described in K.S.A. 2019 Supp. 38-2271(a)(5) and in a manner provided in K.S.A. 60-414(a). This presumption applies when a child has been in court-ordered out-of-home placement under court order for a cumulative total period of one year or longer and the parent has substantially neglected or willfully refused to carry out a reasonable court-approved reintegration plan. The court found Father failed to successfully rebut this presumption.

Although the district court relied on only two factors and the rebuttable presumption, Father evaluates each of the statutory factors in his brief to support his insufficiency of the evidence argument. Because the court did not rely on many of the factors Father analyzed, we decline to consider his arguments on those issues.

a. *DCF's reasonable efforts*

Under K.S.A. 2019 Supp. 38-2269(b)(7), a district court may terminate a parent's rights to his or her child if there is clear and convincing evidence that the reasonable efforts made by public or private agencies to rehabilitate the family have failed. Under this subsection, the relevant social service agencies are obligated to expend reasonable efforts toward reintegrating the child with his or her parents. See K.S.A. 2019 Supp. 38-2201(b)(8) (recognizing that one significant policy goal of the Kansas Code for the Care of Children is for the state to "provide preventative and rehabilitative services, when appropriate, to abused and neglected children and their families so, if possible, the families can remain together without further threat to the children"). The requirement exists to provide a parent with an opportunity to succeed, but to do so requires the parent to exert some effort. *In re M.S.*, 56 Kan. App. 2d 1247, 1257, 447 P.3d 994 (2019).

Father does not appear to challenge the district court's finding that DCF and SFCS made reasonable efforts to rehabilitate the family. The only assertion in his brief that could be construed as a challenge to the court's finding in this regard is a general claim that "he was confused about the requirements for reintegration" and that "the social workers were not clear with him [and] . . . would not listen to him." In the absence of any argument challenging the district court's finding that DCF and SFCS made reasonable efforts to rehabilitate the family, we deem that argument waived. *In re Matter of Adoption of T.M.M.H.*, 307 Kan. 902, 912, 416 P.3d 999 (2018) ("'Where the appellant fails to brief an issue, that issue is waived or abandoned.'"). And even if Father has properly raised the argument, he failed to include in the record on appeal the documents

7

from the DCF or SFCS social files that were available to the court in making its decision on this factor. When this court cannot tell the content of the evidentiary exhibits the district court relied on in making its decision, it presumes that those exhibits contain the necessary information to support the district court's conclusions. See *In re A.A.-F.*, 310 Kan. 125, 141-42, 444 P.3d 938 (2019). Without those exhibits, this court has no way to determine whether the information within the exhibits sufficiently supported the district court's findings. As the appellant, Father bore the burden to designate a record sufficient to show his claimed error and, if the record is insufficient to show error, his claims fail. See *Friedman v. Kansas State Bd. of Healing Arts*, 296 Kan. 636, 644, 294 P.3d 287 (2013).

b. *Lack of effort to adjust circumstances, conduct, or conditions*

Under K.S.A. 2019 Supp. 38-2269(b)(8), a district court may terminate a parent's rights to his or her child if there is clear and convincing evidence of a "lack of effort on the part of the parent to adjust the parent's circumstances, conduct or conditions to meet the needs of the child." Although Father argues the evidence presented at the hearing was insufficient to support the court's finding of unfitness under this standard, our analysis of his argument is again hampered by Father's failure to include in the record on appeal the documents from the DCF or SFCS social files that were available for the court's consideration in making its decision. Without these exhibits, we must presume that they support the district court's conclusions. See *In re A.A.-F.*, 310 Kan. at 141-42. Notwithstanding this presumption, we review the evidence in the record to determine whether there is clear and convincing evidence to support the court's finding that Father failed to put in the effort necessary to adjust his circumstances, conduct, or conditions to meet the needs of the children.

DCF caseworker Caitlin Todd was the first witness called by the State at the termination hearing. Todd testified that after the children were taken into custody, DCF

and SFCS developed a case plan requiring Father to complete various tasks to successfully reintegrate the children into his home. The case plan tasks included maintaining stable housing, maintaining stable employment and providing proof of income, attending a parenting class, and attending visits with his children provided he had a clean urinalysis before each visit.

(1) *Stable employment and income verification*

As part of his case plan, Father was required to maintain stable employment and provide income verification to SFCS. Danielle Lipitrot, the SFCS case manager assigned to this case, testified that Father owned a car detailing business but failed to provide any proof of income throughout the entirety of the case. Father disagreed, stating that SFCS only asked him for proof of income one time in 2018 and, in response, he provided SFCS with two check stubs from 2018.

Father's testimony is not only inconsistent with Lipitrot's, but it is also inconsistent with the other witnesses who testified at the termination hearing. Bridget Ludwig, the court appointed special advocate (CASA) volunteer who worked with the children, testified that she told Father at least seven times since November 2018 that he needed to provide income and housing verification to SFCS. For her part, Lipitrot stated that both she and Ludwig counseled Father to find other employment to help provide stability for himself and the children. When he was told that a supplemental or replacement job could be helpful, Father told Lipitrot that his business brought in sufficient income. Ludwig echoed Lipitrot's testimony and said that Father told her that he did not want to work for someone else and that his children always had what they needed. Ludwig disagreed that Father had always provided for the children because the "kids have been bounced around a lot from motel to hotel." Father admitted that nothing kept him from getting a second job, it was just hard for him to work because he was focused on getting the children back.

Ludwig testified that Father told her he made approximately $7,000 in 2018. Father admitted that he only made that amount when asked if he could provide income verification at the termination hearing. When asked about 2019, Father said he was unaware he needed to provide income verification to SFCS for that year. He said most of his business is done in cash and that he had not done a good job of tracking receipts with his customers. He was unable at the hearing to provide even an estimate for the money he made so far in 2019. When asked how he could assure the district court that he could provide for the children, Father said that he planned to continue working at his detailing business. Lipitrot said there was no threshold amount of money that Father had to make to keep the children, but without it a budget could not be created.

Part of the reason that Father's income was low was because he worked sporadically. Father told Lipitrot that there were times he did not work and that in the winter his business slowed down. Father was not able to estimate the hours he worked in 2018, but he stated that he would charge $75 per car and would work a couple days of the week. Father told Ludwig multiple times that he was working on getting detailing contracts with car dealerships, but he never provided her with anything to substantiate those claims.

(2) *Housing*

Father's case plan also required him to maintain safe and stable housing and provide record of a lease to SFCS. Father argued at the termination hearing that he only moved residences once, but the record demonstrates that Father lived in more than two locations since the beginning of the case.

Father testified he was kicked out of the motel where he and his children were living on November 13, 2017, the night he and Mother left the children alone to go to the hospital for delivery of the new baby. There is no testimony to establish where Father

10

lived during the 12 months from November 13, 2017, to December 2018, when he moved into a two-bedroom residence that he remodeled into a four-bedroom residence. Father made improvements to the house such as new carpet in the bedrooms, new tile, and upgraded appliances. When Jennifer Huerta, the SFCS case worker assigned at the time, came to inspect the place, she told Father that he needed to install smoke detectors and carbon monoxide detectors before the children could visit the house. Father testified that he promptly installed those items.

But the children were never allowed to visit Father at that residence because there was mold in the basement. Father testified he only lived in that residence for two months. There was evidence presented that after leaving the residence he remodeled, he lived in a homeless shelter, stayed with his sister and brother-in-law in Manhattan, Kansas, and lived in his truck. Father said it was difficult for him to find a place to live because he had an eviction on his record from 2014.

Six weeks before the termination hearing, Father found a three-bedroom residence in Clay Center. Father provided the Clay Center lease to SFCS and to Ludwig, the CASA volunteer. The lease, which was signed on June 1, 2019, reflected a monthly rent of $650 with Father having already paid $168 in prorated rent at the time he signed the lease. But for the first time at the termination hearing, Father claimed the new residence was part of a government program that gave him six months of free rent, though he was responsible for utilities. On cross-examination, Father admitted that the lease did not say that the first six months of rent was free, and he had no other documentation to show that this was true. He also admitted that he did not tell SFCS or the CASA volunteer about the program and that the lease, which made no mention of free rent, was the only paperwork he had. Father thought the leasing agent made a mistake on the lease because the agent told him that the first six months were free.

After Father submitted the lease to SFCS, Lipitrot visited Father's Clay Center residence. She believed that it would be an appropriate place for the five children, except for the DCF and SFCS standards that dictate one of the children would need a separate room due to her age and gender. But the worker's primary concerns were that she could not confirm whether Father had sufficient income to make the rent payments in Clay Center, Father's admission that the amount of money he earned fluctuated, and the fact that Father's housing history reflected he could only sustain payment on a lease "for a month to three months at most."

(3) *Parenting class*

In March 2019, Father was tasked with completing a parenting class as part of his case plan. Lipitrot explained that Father was enrolled in a parenting class at Dorothy Bramlage Library in Junction City, Kansas, but he was disenrolled from the class due to lack of attendance. Father only completed 5 of the required 11 classes. Lipitrot said that once someone was disenrolled from a class, he or she must start the entire process again. Father told Lipitrot that he wanted to attend another session, but the next session was cancelled after the instructor had health issues.

Father admitted that he missed two classes but maintained he was not disenrolled for lack of attendance. He said there was a miscommunication between him and the instructor, but that he would be able to attend the next session that started in September 2019. He also said that he found an online class that he could take and pay for himself, but he had not enrolled in that class because he only discovered it a few days before the termination hearing. Nonetheless, the record reflects that Father failed to complete a parenting class before the termination hearing.

(4) *Visitation*

Lipitrot testified that Father failed to consistently attend visits with the children. Lipitrot explained that Father was originally scheduled for three supervised visits per week, but for at least six months prior to the termination hearing, Father was scheduled for one unsupervised visit per week. She could not explain the decrease because she only had been the case manager for six months. Jennifer Hornbuck was the original SFCS case manager. The case then transferred to Jennifer Huerta before ultimately transferring to Lipitrot. Neither Hornbuck nor Huerta testified at the termination hearing.

Nonetheless, Lipitrot knew that Father attended 34 visits and missed 39 visits since the case began. Father missed visitation for various reasons, including transportation, work, other appointments, and not following the terms of the visitation agreement. As part of the visitation agreement, Father had to submit to urinalysis testing and check-in to SFCS by 11 a.m. before visits could occur. Though Father's urinalysis tests had never returned positive, SFCS had to cancel three visits due to Father's failure to appropriately check-in with SFCS. Father testified that it was untrue that he missed 39 visits and that SFCS only cancelled 3 visits, but he also admitted that he did not have any way of proving his claims. He stated that when he did miss visits, it was most often because he was looking for a new residence.

Based on the evidence included in the record on appeal, we conclude the district court's finding of unfitness based on Father's lack of effort to adjust his circumstances, conduct, or conditions to meet the needs of his children is supported by clear and convincing evidence. See K.S.A. 2019 Supp. 38-2269(b)(8).

13

c. *Presumption of unfitness*

K.S.A. 2019 Supp. 38-2271(a)(5) provides that a parent will be presumed unfit if the State establishes by clear and convincing evidence that a "child has been in an out-of-home placement, under court order for a cumulative total period of one year or longer and the parent has substantially neglected or willfully refused to carry out a reasonable plan, approved by the court, directed toward reintegration of the child into the parental home." If this presumption applies, "[t]he burden of proof is on the parent to rebut the presumption of unfitness by a preponderance of the evidence." K.S.A. 2019 Supp. 38-2271(b).

Although he cites to the wrong statute, Father concedes in his brief that a presumption of unfitness applies because the children were in out-of-home placement for 20 months. But Father argues he "overcame that presumption when he provided proof of stable housing and [income], the paramount issues in the case." This conclusory statement is the only attempt Father makes to rebut the presumption of unfitness. But Father's history, as detailed above, shows a pattern of noncompliance with his reintegration plan. The evidence presented at the hearing established that Father failed to maintain stable employment and provide proof of income, failed to obtain stable housing, failed to complete the parenting classes, and failed to maintain a regular visitation schedule. Based on these failures and the fact that the children had been in out-of-home placement for more than a year, the district court found that the presumption of unfitness under K.S.A. 2019 Supp. 38-2271(a)(5) applied and that Father failed to successfully rebut the presumption. For the reasons discussed above, the record supports these findings.

14

2. *Foreseeable future*

Father does not contest the district court's determination that the conduct or condition that rendered him unfit is unlikely to change in the foreseeable future. In the absence of any argument challenging the district court's finding on this issue, we deem that argument waived. *In re Matter of Adoption of T.M.M.H.*, 307 Kan. at 912 ("'Where the appellant fails to brief an issue, that issue is waived or abandoned.'").

3. *Best interests*

The district court found it was in the children's best interests to terminate Father's parental rights based on the length of time the children had been in custody, the adoptive resources available, the agencies' reasonable attempts and failure to reintegrate the children, and Father's failure to adjust his circumstances to meet the needs of the children. Although Father asserts the district court erred when it found termination of his parental rights was in the children's best interests, he cites to no evidence and provides no argument to support the assertion. Although we deem the argument waived, we briefly address the issue. See *In re Matter of Adoption of T.M.M.H.*, 307 Kan. at 912.

In deciding whether termination of parental rights is in the best interests of the child, the court gives primary consideration to the physical, mental, and emotional health of the child. K.S.A. 2019 Supp. 38-2269(g)(1). The district court makes that decision based on a preponderance of the evidence. This decision is within the district court's sound discretion, and an appellate court reviews such a decision for an abuse of discretion. See *In re R.S.*, 50 Kan. App. 2d 1105, 1115-16, 336 P.3d 903 (2014). A judicial action constitutes an abuse of discretion if (1) no reasonable person would take the view adopted by the trial court; (2) it is based on an error of law; or (3) it is based on an error of fact. *In re M.S.*, 56 Kan. App. 2d at 1255.

We find no shortcomings in the district court's assessment of the evidence or applicable legal principles. Therefore, the question presented is whether no reasonable district court would come to the same conclusion. Here, the record shows that at the time of the termination hearing, the children had been in out-of-home DCF custody for 20 months. When they were removed from Father's care, four children were six, three, two, and one years old, and the infant was less than a week old. By the time of the termination hearing, the youngest children had spent the majority of their lives in foster placements. The record also shows that Father failed to secure stable housing or stable income over this 20-month period and was unwilling to find replacement or supplemental employment. Furthermore, Father was not able to articulate to the district court how anything would be different if his parental rights were not terminated. He simply stated that he would work harder to prove to the district court that the children could eventually be reintegrated.

The record also demonstrates that the children were doing well in their placements. Lipitrot testified that the children's foster homes were aware of the children's mental health needs because the foster parents were the ones who asked for mental health assistance. Ludwig buttressed Lipitrot's testimony and said that the children's behavior had improved since being in placement and that the children all had good relationships with their foster parents.

Based on the evidence, a reasonable court could conclude that it was in the children's best interests to terminate Father's parental rights.

Affirmed.