NOT DESIGNATED FOR PUBLICATION

Nos. 127,344
127,345

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interests of H.T. and C.T.,
Minor Children.

MEMORANDUM OPINION

Appeal from Leavenworth District Court; JOAN M. LOWDON, judge. Submitted without oral argument. Opinion filed September 20, 2024. Affirmed.

*Chadler E. Colgan*, of Colgan Law Firm, LLC, of Kansas City, for appellant natural father.

*Ashley Hutton*, assistant county attorney, and *Todd Thompson*, county attorney, for appellee.

Before ARNOLD-BURGER, C.J., GREEN and COBLE, JJ.

PER CURIAM:  The natural father (Father) of C.T. and H.T. appeals the district court's decision to terminate his parental rights. Specifically, Father argues the evidence does not support the district court's finding of his unfitness. But viewing the evidence in the light most favorable to the State, as we are required to do, the record sufficiently supports the district court's findings of Father's unfitness and that it was unlikely to change in the foreseeable future. In our careful examination of the record, we also determine the district court did not abuse its discretion when finding the children's best interests would be served by terminating Father's parental rights. As a result, we affirm the district court's decision.

1

FACTUAL AND PROCEDURAL BACKGROUND

In February 2021, the State filed an application for an ex parte order of protective custody under K.S.A. 38-2242 claiming H.T. and C.T. were children in need of care (CINC). The State alleged that C.T., who was then four years old, and H.T., then two years old, had bruises in various states of healing which were diagnosed by medical personnel as abuse. This was not the children's first time in Department for Children and Families' (DCF) custody, as Mother and H.T. previously tested positive for drugs at the child's birth in 2018. The State's 2021 application also argued that the continued failure of both parents to cooperate with services set up by public and private agencies warranted removal of the children. An affidavit by Melissa Ney, a DCF social worker, detailed her investigation leading to the State's application.

A few weeks before the application, DCF received a report claiming the children were physically and emotionally abused by Mother, as both children had visible physical injuries. Ney met with the children at their paternal grandmother's (Grandmother) home and witnessed those injuries. Grandmother reported to Ney that the children would tell her about the marks on them when they visited her. Grandmother reported that she asked Father about bruising on the children, and he recounted two incidents that caused him concern. Grandmother said Father said he heard each child screaming when alone with Mother, but he was unable to see what happened.

Although the children were initially unable to be interviewed due to their age, speech delays, and activeness at Grandmother's home, C.T. was later interviewed at the Child Advocacy Center. C.T. admitted his injuries came from Mother, and during the attempted interview, although he could not verbally acknowledge abuse, H.T. showed signs of abuse. After the interview, law enforcement encouraged Grandmother to take the children to Children's Mercy Hospital, which she did.

During a family meeting with DCF, both parents agreed to leave the children in Grandmother's care until the pending hospital report was received. The parents also agreed that any finding of child physical abuse would result in court involvement. Mother and Father consented to participate in family services and provide urinalyses. A week later, the hospital report diagnosed both children with child physical abuse and recommended multiple therapies for the children and the parents. The parents agreed to work with family preservation services and to participate in the tasks that DCF deemed necessary.

Ney's affidavit noted recurring concerns of drug use by both parents. Mother had lost a significant amount of weight in a short period of time but denied it was because of drug use. Father reported that he thought Mother was using methamphetamines for the past few months due to her behavior, and both parents reported smoking marijuana. Mother reported recent use of "other drugs" besides marijuana, but she denied using drugs when the children were home. Both parents said Mother's alcohol consumption had decreased and there were no concerns of over-consumption of alcohol. Ney's affidavit reported both parents failed to show for a scheduled urinalysis.

The parents expressed conflicted interests regarding DCF taking the children, at times suggesting they would sign their rights away and then changing their minds. The parents conveyed difficulty caring for the children due to the children's overwhelming, active behavior. Mother said she required mental health services for anxiety and depression due to staying home with the children all day and night. Father expressed Mother should not be alone with the children and she did not deserve to have them.

Ney's affidavit also contained a chronological history of the family's involvement with DCF, beginning with concerns regarding Mother and a half-sister in 2012, then neglect involving Father in 2016, and including the children who are the topics of this

case from 2017 through 2019. The children's half-sister was the subject of a separate action and is not the topic of this appeal.

Based on these facts and others contained in her affidavit, Ney concluded both children were CINC given their apparent lack of adequate parental care, allegations of abuse, and the parents' delay in presenting a plan to keep the children safe. On February 19, 2021, the district court granted the State's application and issued a protective order finding probable cause to support the State's allegations that the two children were subject to child abuse. The court ordered the children to be placed in the protective custody of DCF and appointed a guardian ad litem (GAL) to represent them. The State filed its petitions in each of the children's cases that same day, claiming the children were CINC because they were without adequate parental care (K.S.A. 38-2202[d][1]); they were without the care needed for their physical, mental, or emotional health (K.S.A. 38-2202[d][2]); and they had been physically or emotionally abused or neglected (K.S.A. 38-2202[d][3]).

A few months later, Father entered a voluntary no-contest statement to the CINC petitions for C.T. and H.T. After several continuances, the district court then held a disposition hearing. Both Mother and Father were present. The court found its previous findings and orders were to remain in effect and the children were to remain in the temporary custody of DCF. The court approved the social service agency Cornerstone of Care's (COC) reintegration plans for both parents.

Various review and permanency hearings followed over the course of the next several months. Although Mother's visitations remained contingent on clean drug tests, the court eventually terminated the order for Father's drug testing, unless DCF or COC specifically asked for a drug screen. In the spring of 2022, at a third permanency hearing, the district court warned the parents that now was the "time to make any and all progress towards reintegration." But the district court determined the parents' progress toward

4

reintegration was not adequate, found reintegration was no longer a viable goal, and either adoption or permanent custodianship might be in the children's best interests.

Within the next 30 days, the State filed a motion for finding of unfitness and termination of parental rights in both cases. The State alleged both Mother and Father were unfit due to multiple statutory factors, that their conduct or condition was unlikely to change in the foreseeable future, and reintegration was no longer a viable alternative. The State alleged termination of parental rights was in the children's best interests.

The district court held a termination hearing for both parents and all children four months later, in August 2022. Both parents appeared. Again, because the findings related to the half-sister are not at issue in this appeal, we do not address them here. As to C.T. and H.T., the court admitted as evidence exhibits from the State and Father. The State presented Jerica Thorne, case manager from COC, as a witness. Thorne testified she created the reintegration plan for the parents and explained the tasks the parents were required to complete. Thorne also testified as to the progress of the parents during the pendency of the reintegration plan. During cross-examination by Father's counsel, Thorne further detailed Father's progress on the reintegration plan. During Thorne's testimony, the court interrupted due to time constraints and continued the termination hearing to a later date.

The district court took up the hearing in October 2022, resuming with Thorne's testimony. Again, both parents were present. Thorne continue to testify about Father's progress on the reintegration plan. Thorne also testified Father had four tasks outstanding, including level one outpatient treatment, an eight-hour online domestic violence class which COC would pay for, a walkthrough of the home to which he had recently moved, and individual therapy. Thorne also testified that there were a couple of times during the pendency of the case where the parents separated, and during those periods, the parents

5

seemed to expend more energy toward the reintegration plan for a short time, until the parents reunited.

Both parents also provided testimony, and Father provided a COC report as additional evidence. Father admitted he had a difficult time early in the case when he was homeless and due to the COVID-19 pandemic. He later found full-time employment with the Kansas Department of Labor, a part-time job in a restaurant, and recently moved into his father's residence. Father said he had, just days before the second termination hearing, decided to separate from Mother because he thought it would be better for himself and the children. Father also testified he intended to file for divorce probably within a month and that he had already begun to divide any property they jointly owned. Father said he would do whatever was necessary to finish the reintegration plan and avoid termination of his parental rights.

At the GAL's request, the district court received all remaining COC and other agency reports as evidence to be considered. After all the parties provided closing arguments, the district court took the matter under advisement.

The district court issued a written ruling on April 17, 2023. The district court found there was clear and convincing evidence that Father was unfit under K.S.A. 38-2269(b)(2), (7), (8), and (c)(3), and the conduct or condition was unlikely to change in the foreseeable future for reasons discussed in more detail below. The court terminated Father's parental rights.

Father timely appeals.

THE DISTRICT COURT DID NOT ERR IN ITS FINDING OF FATHER'S UNFITNESS

Father now argues on appeal that there was insufficient evidence to support the district court's decision that he was unfit to care for his children and the conduct or condition was unlikely to change in the foreseeable future.

*Applicable Legal Principles*

The fundamental nature of a parent's right to parent his or her children demands that to terminate parental rights, the State must prove "by clear and convincing evidence that the parent is unfit by reason of conduct or condition which renders the parent unable to care properly for a child and the conduct or condition is unlikely to change in the foreseeable future." K.S.A. 38-2269(a); see *In re R.S.*, 50 Kan. App. 2d 1105, 1113, 336 P.3d 903 (2014).

After a district court has adjudicated a child as CINC under the Revised Kansas Code for Care of Children (Code), K.S.A. 38-2201 et seq., the court may subsequently terminate a parent's rights only if the State proves two elements by clear and convincing evidence:  (1) the parent is unfit; and (2) the conduct or condition which renders the parent unfit is unlikely to change in the foreseeable future.  If the court makes a finding of unfitness, the court will consider whether termination of parental rights is in the best interests of the children. K.S.A. 38-2269(a), (g)(1). The statute lists multiple nonexclusive factors the district court shall consider in making its determination of unfitness. K.S.A. 38-2269(b)(1)-(9), and (c)(1)-(4). These factors may amount to unfitness singularly or in combination, and any one of the factors may, but does not necessarily, establish grounds for termination. K.S.A. 38-2269(f).

In reviewing the district court's finding of Father's unfitness, "this court must determine, after reviewing all the evidence in a light most favorable to the State, whether

7

a rational fact-finder could have found the ultimate determination to be highly probable, i.e., by clear and convincing evidence." *In re T.H.*, 60 Kan. App. 2d 536, 547, 494 P.3d 851 (2021). Our Supreme Court explained that "'clear and convincing evidence'" requires the fact-finder to believe "that the truth of the facts asserted is highly probable." *In re B.D.-Y.*, 286 Kan. 686, 697, 187 P.3d 594 (2008). "Appellate courts do not weigh conflicting evidence, pass on the credibility of witnesses, or redetermine questions of fact.'" *In re Adoption of Baby Girl G.*, 311 Kan. 798, 806, 466 P.3d 1207 (2020). In short, in our review we must weigh any conflicts in evidence to the benefit of the State and against Father.

*The district court's finding of Father's unfitness was supported by sufficient evidence.*

Here, the district court found Father's unfitness grounded on four factors, which were also outlined in the State's motion for termination. On appeal, Father argues the State failed to present clear and convincing evidence to the district court to support each of its findings under all four factors. We examine each statutory factor and its supporting evidence in turn.

1. *K.S.A. 38-2269(b)(2)—Physical or Emotional Abuse of the Children*

First, Father argues insufficient evidence supports the district court's findings that he was unfit under K.S.A. 38-2269(b)(2). He claims the record presents no evidence showing that Father was "'physically, emotionally or sexually cruel or abusive'" towards the children. Father acknowledges there was evidence that Mother engaged in physical child abuse, but he asserts he moved out of Mother's home and was filing for divorce, which undermines the court's basis for determining his unfitness.

As the district court noted in its written order, the children were removed from their parents' care for the first time in 2018 and successfully reintegrated. Despite this

8

reintegration, the children were again physically, mentally, and emotionally abused and neglected in the family home—a home which included Father. The district court found:

> "At a minimum, Father knew that the [children] were being abused and neglected by their mother. . . [and in] spite of that knowledge, Father chose to continue his relationship with their mother. Father, at a minimum, did not protect his children from Mother's abuse and neglect, thereby engaging in mental and emotional abuse and also neglect himself per K.S.A. 38-2202(y) and (t)."

The district court detailed that it partially based its findings on Father's no-contest statement to the CINC petition, which included an allegation that the children had been physically, mentally, or emotionally abused or neglected. The court also found that multiple reports and affidavits from the engaged social service agencies supported a finding of physical abuse. The district court referenced information contained in the play therapy reports by Kristina White, the children's mental health therapist, and described the report to be true, accurate, and credible. This report noted both children suffer from post-traumatic stress disorder, which develops following exposure to a traumatic or stressful event, including physical or sexual abuse or neglect. Finding White's report credible, the district court found it supported a finding of physical, mental, or emotional abuse and of neglect.

K.S.A. 38-2202(y) defines physical, mental, or emotional abuse as "the infliction of physical, mental or emotional harm or the causing of a deterioration of a child and may include, but *shall not be limited to*, maltreatment or exploiting a child to the extent that the child's health or emotional well-being is endangered." (Emphasis added.) This statute does not explicitly include a parent's failure to prevent a partner's abusive behavior. But the statute's plain language provides a broad definition of abuse. And, it is important to recognize that abuse under the Code includes a child who "has been physically, mentally or emotionally abused *or neglected* . . . ." K.S.A. 38-2202(d)(3). The statutory definition of "neglect" includes "acts or omissions by a parent," and a "failure to provide adequate

9

supervision of a child or to remove a child from a situation . . . that results in bodily injury or a likelihood of harm to the child." K.S.A. 38-2202(t)(2). So, the definitions in the Code show a parent's failure to prevent harm can be considered under the broad definition of abuse or neglect.

Here, the district court found Father "allowed the children to be repeatedly abused and neglected by Mother. Not only did he fail to stop the abuse and neglect, but he also attempted to mitigate it to others and hide it from DCF. Father, himself, in how he chose to act, engaged in abuse and neglect of his children." We can find no fault with this analysis. Father provides no other argument or authority to support his claim that the district court lacked clear and convincing evidence to support he was unfit under K.S.A. 38-2269(b)(2) because he was not the one physically abusing the children. Failure to support a point with pertinent authority or failure to show why a point is sound despite a lack of supporting authority or in the face of contrary authority is like failing to brief the issue. *In re Adoption of T.M.M.H.*, 307 Kan. 902, 912, 416 P.3d 999 (2018).

Viewing the evidence in the light most favorable to the State, we find a reasonable fact-finder could have found it highly probable that Father was unfit to properly care for his children under K.S.A. 38-2269(b)(2).

2. *K.S.A. 38-2269(b)(7)—Failure of Reasonable Agency Efforts*

Next, Father argues the evidence does not support the district court's finding of unfitness under K.S.A. 38-2269(b)(7), failure of reasonable efforts made by appropriate public or private agencies to rehabilitate the family.

The district court found that despite COC offering both case plan meetings and monthly meetings with Father to assist in completion of his reintegration plan tasks, Father completed some tasks, but not all. The court acknowledged that Father continued

10

to make some efforts toward reintegration with his children, even after the termination hearing. Yet the court found Father still had incomplete tasks remaining even after the additional time was provided.

On appeal, Father claims the record demonstrates he met 21 out of the 25 tasks set forth in the reintegration plan as of date of the termination hearing. The hearing testimony of Thorne supports his claim that the outstanding tasks were "level one outpatient treatment, the online domestic violence DV class which Cornerstones can pay for, a walkthrough of the home, and individual therapy."

Father argues the level one outpatient treatment should be overlooked because, after a period of missed and positive THC drug tests in mid-2021, his drug screenings were negative for a long period of time, he was removed from the screening requirement, and he completed his RADAC (alcohol and drug) assessment. As for the online domestic violence class, he asserts that the program could be taken online and would likely be completed within a week or two. He also claims the walkthrough of the home could have been completed previously but Father separated from Mother shortly before the termination hearing and his new home was yet to be visited. And, as to the individual therapy, Father argues although he did not complete individual sessions, he was engaged in couples therapy with Mother and the court did not consider that in its analysis. In sum, Father complains that because only minimal items remained on the reintegration plan, the court should have allowed him to finish the reintegration process because he had made "tremendous strides." He cites to a 2019 case of this court to reason that the law requires only "reasonable efforts," not "effective efforts." *In re M.S.*, 56 Kan. App. 2d 1247, 1257, 447 P.3d 994 (2019).

But Father misinterprets this authority, as *In re M.S.* discusses the reasonableness of the agencies' efforts and distinguishes this from the effort required by a parent to

cooperate with those agencies. 56 Kan. App. 2d at 1257-58. Here, Father does not dispute the agencies' efforts, but he suggests his own efforts were sufficiently reasonable.

As the district court stated in its order terminating Father's parental rights, there is no denial that Father completed many of the reintegration tasks. Yet the record shows Father failed to complete some important tasks assigned under the reintegration plan even when he was given more than a year to comply. Father's claim on appeal that he could achieve some of his outstanding tasks rather quickly actually weighs against his showing of effort during the life of this case. For example, testimony showed the domestic violence class could be completed online in eight hours, yet Father inexplicably still had not yet completed it at the time of the second half of the termination hearing. Father did not seek his required psychological assessment until shortly before the first termination hearing in August 2022—almost 18 months after the children were removed from the home. And, at the time of the continued hearing two months later, he had sought absolutely no individual therapy as required. Although he relies on the couples therapy the parents sought together to meet this requirement, this couples therapy did not occur until the period between the termination hearings.

When viewed in a light most favorable to the State, the evidence provided sufficiently supports the district court's findings that Father failed to rehabilitate the family despite the reasonable efforts made by the agencies. The district court did not err in finding Father's unfitness under K.S.A. 38-2269(b)(7).

3. *K.S.A. 38-2269(b)(8)—Parent's Efforts to Adjust Circumstances for Children*

Father next challenges the district court's findings of his unfitness under K.S.A. 38-2269(b)(8), concluding a "lack of effort on the part of the parent to adjust the parent's circumstances, conduct or conditions to meet the needs of the child[ren]." The district court found that, since the children were removed from the home, Father has engaged in

some efforts to adjust his circumstances to achieve reintegration. But the court also noted that at times "Father's progress has stalled." Although Father had visits with his children over the course of the case, he "missed many as well," and his "reintegration tasks remain[ed] incomplete."

But Father cites Thorne's testimony regarding his continued visits with the children as an indication of his continued efforts. He also claims his own testimony shows his efforts to adjust his circumstances to meet the children's needs. He emphasized he separated from Mother and moved to his father's residence to better himself for his children. Father also testified that he has made significant improvements to his living situation and employment to be able to get the children back. Essentially, Father claims that the accomplishments from the reintegration plan show he adjusted his circumstances and those should outweigh the incomplete tasks.

Again, the record does demonstrate that Father undertook some efforts to adjust his circumstances. Yet Father ignores the testimony that does not favor those efforts. Thorne—the only social worker appointed throughout the pendency of the case—testified regarding the reintegration plan approved by the court in August 2021—one year before the first termination hearing. Thorne testified she submitted the written plan to the parents at least three times and discussed it with them verbally several times. Even so, Father did not complete his RADAC assessment until 10 months later. That assessment recommended Father should take outpatient drug and alcohol classes and receive drug and alcohol therapy. At the time of the termination hearing, Father had not begun such classes or therapy. Although Father was released from his requirement for regular drug screening, of the 26 screens he was eligible for over an 18-month period, he failed to show for 14—over half—of those screenings. And though he had been released from drug testing in this case, court reports admitted as evidence at the termination hearing showed he was still subject to pending drug charges in the state of Missouri.

13

Another task included in the plan was for Father to complete a domestic violence assessment. Despite Thorne having located an online course for the parents and provided information to them about the course on at least three occasions, as well as offered for COC to pay for the course, Father still had not completed the course as of the termination hearing.

Father did complete a psychological evaluation as required—one month prior to the termination hearing—but that evaluation recommended he receive both family therapy with Mother and individual therapy. As discussed, he had not yet begun individual therapy, and apparently did not believe it was necessary since he suggested the court look to the family therapy as meeting that requirement.

Even though he was sporadically consistent with his visits with his children, Thorne testified that although the visits were to last two hours, there were several times the parents requested just one hour. Visits had not yet progressed to being unsupervised as the parents had yet to be fully engaged in their mental health treatment recommendations or been consistent with visitations for extended amounts of time. Given these concerns, the testimony evidencing the children's needs for extensive mental health treatment and therapy, and the need for consistency with those treatments, it is reasonable to question whether Father would be up to those tasks for his children. Thorne characterized the parents' efforts at reintegration as "sporadic" and recommended the children would "best thrive if they were to remain" with Grandmother.

A parent must demonstrate some level of effort to not be found unfit under K.S.A. 38-2269(b)(8). *In re M.S.*, 56 Kan. App. 2d at 1257. Here, it is evident Father demonstrated some effort to reintegrate with his children. But it is also evident that he was unable to complete the tasks assigned to him in the reintegration plan over the span of more than a year. Again, the tasks that were incomplete could have been completed in a short amount of time—an assertion Father himself makes. And if that is true, it is more

14

troubling that Father did not complete those tasks in a timely manner and either postponed making those changes until the last minute or failed to complete them at all.

The district court clearly stated that it "questioned [Father's] testimony that he intended to permanently end his relationship with Mother" and, moreover, the court "did not find [Father] credible when he testified that he was willing to do whatever was necessary to complete reintegration." Again, this court does not reweigh conflicting evidence, pass on the credibility of witnesses, or redetermine questions of fact. *In re Adoption of Baby Girl G.*, 311 Kan. at 806.

Given the evidence presented and the district court's credibility determinations, we find clear and convincing evidence supported its decision that Father failed to make the necessary, timely efforts to adjust his circumstances, conduct, or conditions to meet the needs of his children under K.S.A. 38-2269(b)(8).

4. *K.S.A. 38-2269(c)(3)—Failure to Reintegrate Children Into Parental Home*

In his final argument on the factors of unfitness, Father challenges the district court's finding that he was unfit under K.S.A. 38-2269(c)(3) because he failed to carry out a reasonable plan approved by the court directed toward the integration of the children into a parental home. He recycles the same arguments he presented above: he completed most of the reintegration tasks, he should have been permitted to complete the remaining tasks rather than having his parental rights terminated, and he made significant moves to adjust his circumstances and conditions by moving out of the home and intending to file for divorce.

The district court reiterated that it found Thorne a credible witness, and even with the additional time granted, Father failed to complete all his reintegration tasks. Whether it was Father's inability or unwillingness to complete those tasks, all of the incomplete

15

tasks go directly to the heart of the issues leading to the children's removal: domestic violence training, individual therapy, and substance abuse classes. None of the social services representatives involved in the children's care had recommended so much as unsupervised visitation as of the date of the termination hearing, let alone supervised time with the parents.

Again, based on the witnesses' testimony and admitted exhibits, the district court did not find Father credible when he said he intended to do whatever was necessary to complete the reintegration. And, although Father focuses on his separation from Mother and intent to file for divorce, Thorne's testimony shows this was at least the third separation since the children were taken into state custody—albeit the longest separation—and the court did not find Father's testimony regarding his relationship with Mother to be credible.

As repeated above, we cannot weigh conflicting evidence, pass on the credibility of witnesses, or redetermine questions of fact. *In re Adoption of Baby Girl G.*, 311 Kan. at 806. These actions are within the purview of the district court. As a result, viewing the evidence presented in the light most favorable to the State, a rational fact-finder could determine it was highly probable by clear and convincing evidence Father failed to achieve the necessary tasks to reintegrate the children into his home under K.S.A. 38-2269(c)(3).

And, to conclude the affirmation of the district court's finding of Father's unfitness, we offer one observation which the parties ignored. Clear and convincing evidence of any *single* factor under the statute, standing alone, may establish sufficient grounds for termination. K.S.A. 38-2269(f). Despite Father's efforts at many of his reintegration tasks, even ignoring those factors discussing such tasks and focusing on the first factor—physical or emotional abuse of the children—is sufficient to uphold the district court's decision.

16

THE DISTRICT COURT'S FINDING OF FORESEEABILITY

Father also challenges the district court's finding that his condition of unfitness is unlikely to change. Again, Father focuses on the same set of facts argued above, claiming that he made demonstrable steps to reintegrate with his children.

Under K.S.A. 38-2269(a), in addition to the unfitness finding, the court must find the evidence clear and convincing that the conduct or condition which created the lack of fitness is unlikely to change in the foreseeable future. When determining whether Father's conduct was likely to change, we are to consider the "foreseeable future . . . from the child's perspective, not the parent['s], as time perception of a child differs from that of an adult." *In re R.S.*, 50 Kan. App. 2d at 1117.

Here, the district court found by clear and convincing evidence the unfitness of Father was unlikely to change in the foreseeable future due to the chronic nature of the parental shortcomings despite public and private agency assistance. The court emphasized this was the second time the children had been removed from the parents' custody since 2018, and despite the education the parents received during the children's first removal, the children were subject to removal a second time due to the parents' continued inability to appropriately parent them. The court also expressed that the children were repeatedly exposed to abusive parenting by Mother and that Father, "at a minimum, allowed the children to be repeatedly abused and neglected by Mother." As discussed above, the court found Father not only did not step in to stop the abuse but tried to mitigate and hide it. The court also noted the length of time the children had been in DCF custody during the pendency of this second case and the fact that Father did not complete all of his reintegration tasks.

C.T. was four years old and H.T. was two years old at the time the children were taken into DCF custody in this matter. The children remained in DCF custody for more

17

than 18 months pending the final termination hearing, which was nearly half of H.T.'s life to that point—not including the children's prior stint in DCF custody. As discussed above, Father's continued failure to fully complete the reintegration plan during those 18 months was also an indicator that his actions were unlikely to change in the foreseeable future. We have previously recognized that parent's past conduct may be used as a predictor of future unfitness. *In re M.S.*, 56 Kan. App. 2d at 1264.

We acknowledge that Father holds a different perspective on the facts of the case, but we must take the evidence in the light most favorable to the State. On our careful review of the record, we find a rational fact-finder could have found the district court's conclusion that Father's unfitness was unlikely to change in the foreseeable future to be highly probable; that is, supported by clear and convincing evidence. See *In re B.D.-Y.*, 286 Kan. at 697.

### THE DISTRICT COURT'S FINDING OF THE CHILDREN'S BEST INTERESTS

In his final argument, Father claims the district court erred by deciding that termination of his parental rights was in the best interests of the children.

Once a court concludes that a parent is unfit, the court must then consider whether termination of parental rights is in the best interests of the children. In considering the children's best interests, the court should place the most weight on the physical, mental, and emotional health of the children. K.S.A. 38-2269(g). "If the physical, mental or emotional needs of the child would be best served by termination of parental rights, the court *shall* so order." (Emphasis added.) K.S.A. 38-2269(g)(1).

At this stage, the district court is given broad discretion to determine the best disposition for the children. See *In re R.S.*, 50 Kan. App. 2d at 1115-16. We, then, review this dispositional decision for an abuse of judicial discretion, which happens when no

reasonable person would agree with the district court's decision, or the district court bases its decision on a factual or legal error. See *State ex rel. Secretary of DCF v. Smith*, 306 Kan. 40, 60, 392 P.3d 68 (2017). The party claiming an abuse of discretion bears the burden of establishing such abuse. *In re K.E.*, 294 Kan. 17, 23, 272 P.3d 28 (2012); *In re P.J.*, 56 Kan. App. 2d 461, 465-66, 430 P.3d 988 (2018).

The district court articulated several reasons supporting its finding that termination of Father's parental rights was in the best interests of the children. The court first referenced its findings of fact under unfitness, then considered the age of the children and the fact that this was the second time the children were placed in DCF custody since 2018. It articulated that the children were subjected to continuous abuse by Mother, and Father took no action to prevent the abuse or neglect, even despite the earlier education provided when the children were previously removed. The order mentioned Father's "intermittent effort" toward integration and considered the extended period the children had been in family placement and their placement's interest in becoming a permanency option. The district court found it was in the best interests of the children to not have to wait longer for permanency.

Father disagrees and maintains the best interests of the children would have been served by reintegration with him. Father again only reiterates that he intended to divorce Mother and moved out of their shared residence. Father also restates his prior arguments regarding his completion of many of the reintegration tasks. He argues the district court's finding that he attempted to mitigate or hide Mother's abuse from DCF is unsupported by evidence and the court's categorization of his efforts as "intermittent" is also unsupported since he only had a few tasks remaining.

As we have discussed throughout this opinion, although Father made progress in completing his reintegration plan, he spent over a year idling on the remaining tasks, which prevented him from progressing to unsupervised visits with the children. Due to

19

the parents' actions, the children had spent most of their young lives outside the parents' care. Given the unfitness and foreseeability findings, which we have already concluded were supported with clear and convincing evidence, and the best interests determination that is supported by the preponderance of evidence presented, we cannot say no reasonable person would agree with the district court's decision terminating Father's parental rights.

Affirmed.